USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1962 DEBRA HORTA, Plaintiff, Appellant, v. CHARLES B. SULLIVAN, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. A. David Mazzone, U.S. District Judge] ___________________ ____________________ Before Torruella, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Sheila M. Tierney with whom Tierney Law Office was on brief for _________________ ___________________ appellant. Linda M. Walsh with whom Kroll & Tract was on brief for appellees ______________ _____________ Charles B. Sullivan, Paul G. Sadeck, Edward Mello and the Town of Freetown. James F. Gettens with whom Healy & Rocheleau, P.C. was on brief ________________ ________________________ for appellees Jeffrey Mennino, James K. Bowles, and the Town of Lakeville. ____________________ August 31, 1993 ____________________ CAMPBELL, Senior Circuit Judge. A passenger ______________________ injured after police officers had chased the motorcycle on which she was riding sued the police officers, the towns, and the town police chiefs in the district court under 42 U.S.C. 1983 and state law. The district court granted summary judgment for all defendants on all counts. Appellant appeals, but only as to the 1983 claims against the police officers and the pendent Massachusetts Tort Claims Act claims against the two towns. We affirm in part, vacate and remand in part, and certify a question of law to the Massachusetts Supreme Judicial Court. I. I. The following facts are not in dispute. On Friday, August 5, 1988, at approximately 9:18 p.m., appellee Jeffrey Meninno, a Lakeville Police Officer, was traveling in his police cruiser north on County Road in Lakeville, Massachusetts, when he observed a motorcycle approaching him in the southbound lane in excess of the posted speed limit.1 Officer Meninno activated the cruiser's blue lights as the motorcycle approached. He then turned his cruiser around and  ____________________ 1. Officer Meninno stated that his radar gun, which he was operating as he drove along County Road, measured the motorcycle's speed as 59 miles per hour. The posted speed limit on County Road was 40 miles per hour. A photograph of the radar gun, showing a reading of 59 miles per hour, was attached as an exhibit to Meninno's deposition. -2- began to pursue the motorcycle. Instead of pulling over, the motorcycle accelerated. When appellant Debra Horta, riding on the back of the motorcycle, realized that the police car was following them, she told the motorcycle operator, James F. Demoranville, to stop because "it isn't worth it." Demoranville refused. "He just said to tuck my head in between his shoulders and hang on." Appellant remembers nothing about what occurred after that moment. Officer Meninno accelerated to keep up and followed the motorcycle along County Road from a distance of a few hundred feet, backing off a number of times when it appeared that the bike was wobbling and the riders might fall off. The chase reached speeds of seventy-five to eighty miles per hour, as Meninno watched the motorcycle drive erratically, pass at least one car, and swerve into and drive in the opposite lane. Meninno unsuccessfully attempted to record the motorcycle's license plate number. As the pursuit continued on County Road, Officer Meninno radioed a report to the Lakeville police dispatcher, telling her of the pursuit and asking her to notify the police department in the neighboring town of Freetown that the motorcycle was heading toward the Lakeville-Freetown line. Appellee Charles B. Sullivan, a police officer in Freetown, heard Meninno's transmission but did not yet -3- contact Lakeville. At that time Sullivan and appellee Paul G. Sadeck, another Freetown police officer, were parked in separate cruisers on Route 18 in Freetown. Sullivan told Sadeck about the chase and then drove south on Route 18 toward the intersection of Route 18 and Mason Road. Mason Road runs between County Road and Route 18. Meninno contacted the Lakeville dispatcher again, notifying her that the motorcycle had left Lakeville and entered Freetown. Sullivan then informed the Lakeville dispatcher and Meninno that the Freetown police would assist. The motorcycle slowed down to thirty miles per hour, with Meninno doing the same, before turning left from County Road onto Mason Road and accelerating again to over sixty miles per hour.2 Officer Meninno kept up and told Sullivan by radio that he and the motorcycle were now proceeding eastbound on Mason Road. He also warned Sullivan that, "He's driving recklessly. Be careful." Sullivan informed Meninno that he was now coming in the other direction on Mason Road, getting closer to Meninno and the speeding motorcycle.  ____________________ 2. Mason Road is a paved, two-lane road approximately 24 feet wide with a double solid yellow line separating the lanes and a posted speed limit of 30 miles per hour. The segments of County Road and Mason Road on which the pursuit took place are sparsely populated residential and undeveloped areas. That evening, Mason Road was dry and traffic was light. -4- As the motorcycle and Meninno continued east on Mason Road, Officer Sullivan stopped his police cruiser in the eastbound lane of the two-lane road, facing west. He left the transmission in Drive and "stood on the brakes" to keep the cruiser stationary. The westbound lane directly next to Sullivan's cruiser was unobstructed.3 In front of the cruiser, the road ran straight for approximately 480 feet before it turned. Sullivan could not see around the bend to the approaching motorcycle and police car, nor could the latter yet see his car. Sullivan illuminated the cruiser's blue lights, take-down lights,4 and headlights. No streetlight illuminated the point at which the cruiser was parked, but the road was lit at the bend and the take-down lights illuminated part of the road in front of the cruiser. Officer Meninno and the motorcycle were traveling along Mason Road at sixty or sixty-five miles per hour when Officer Sullivan advised Meninno by radio of his precise  ____________________ 3. Officer Sadeck, in another cruiser, was heading for Mason Road at this time but did not arrive on the scene until after the crash. While appellant alleged in her complaint that Sadeck arrived prior to the crash and that his cruiser formed part of a "staggered roadblock," there is no admissible evidence in the record supporting this allegation. See infra _________ Part II. 4. Take-down lights are small white lights affixed to the roof of the police cruiser and located in between two sets of flashing blue lights. The take-down lights on Officer Sullivan's cruiser were directed toward the front of the cruiser and illuminated a portion of the area in front of the car. -5- location, warned him to "back off" and that he had the road "blocked." Meninno says that he did slow down, but the motorcycle continued on apace. Fifteen to twenty seconds elapsed before Sullivan saw the motorcycle, with Demoranville and appellant on it, round the bend in Mason Road with Meninno's cruiser some distance behind it.5 Demoranville, still driving in the eastbound lane, appeared to slow the cycle down and steer toward the roadside on his right. However, he apparently lost control of the motorcycle, which fell on its side and slid along the roadway until it collided with the front of Officer Sullivan's stationary police cruiser. The cruiser rose up in the air on impact, Demoranville became wedged underneath the car, and appellant Horta fell backwards off the motorcycle. Meninno eventually stopped without skidding or taking evasive action. Demoranville died within the hour and Horta sustained serious, permanent injuries, resulting in a month-long coma and eventual amputation of her left leg. Three to four minutes elapsed from the time Officer Meninno began the pursuit to the time the motorcycle collided with Sullivan's cruiser. The pursuit covered 3.2 miles. At  ____________________ 5. Meninno stated in his deposition that he was approximately 250 feet behind the motorcycle when he rounded the turn. Sullivan estimated only that the distance was "no less than" 50 to 75 feet. The evidence is unclear as to how fast the motorcycle was going when it rounded the last bend on Mason Road. -6- no time did Officer Meninno's police cruiser make physical contact with the motorcycle or its passengers.6 Appellant Horta brought this civil action for money damages on June 25, 1991, in the United States District Court for the District of Massachusetts against seven defendants Officers Meninno, Sullivan, and Sadeck; the Town of Lakeville and the Town of Freetown; and Lakeville Police Chief James K. Bowles and Freetown Police Chief Edward Mello. The complaint contained six counts, alleging that Meninno, Sullivan, and Sadeck were liable to Horta under 42 U.S.C. 1983 and 1985 for violation of her constitutional rights (Count I); under Mass. Gen. L. ch. 12, 11H and I for violation of her civil rights (Count II); and under the Massachusetts Tort Claims Act, Mass. Gen. L. ch. 258, for negligence (Count III). Horta also alleged that the towns of Lakeville and Freetown were liable to her under the Massachusetts Tort Claims Act for the negligent actions of Meninno, Sullivan, and Sadeck (Count IV), and that Chief Bowles, Chief Mello, Lakeville and Freetown were liable to her under 42 U.S.C. 1983, 1985 and 1988 (Count V) and under Mass. Gen. L. 11H and I (Count VI).  ____________________ 6. It is undisputed that no non-police vehicles or pedestrians were on Mason Road near the accident scene at the time of the collision. -7- The defendants moved for summary judgment, which the district court granted on July 8, 1992.7 Horta now appeals from the final judgment dismissing her complaint.  ____________________ 7. The district court separately granted Meninno's motion for judgment on the pleadings as to Count III. Appellant filed no opposition to the motion and does not appeal from that portion of the district court's order. -8- II. II. Horta challenges only the district court's granting of summary judgment on Counts I and IV, hence waiving any appeal concerning Counts II, III, V and VI. See Fed. R. App. ___ P. 28(a)(3), (5); Brown v. Trustees of Boston Univ., 891 F.2d _____ ________________________ 337, 352 (1st Cir. 1989), cert. denied, 496 U.S. 937 (1990). ____________ We turn first to a disagreement over what materials are properly in the summary judgment record. Appellees moved in the district court to strike seven exhibits two affidavits, three newspaper articles and other documents that Horta submitted with her opposition to the motion for summary judgment. Appellees argued, inter alia, that the _____ ____ exhibits contained inadmissible hearsay, were not in proper form, and were not properly sworn to or certified under Fed. R. Civ. P. 56. The district court denied the motion to strike without comment. Appellees now assert that we should disregard the exhibits for purposes of deciding, in this appeal, whether or not to uphold summary judgment. See Carey ___ _____ v. Bahama Cruise Lines, 864 F.2d 201, 203 n.1 (1st Cir. 1988) ___________________ ("An appellee need not cross-appeal 'to argue that there are alternative grounds that support the judgment below.'" (quoting Jasany v. United States Postal Serv., 755 F.2d 1244, ______ __________________________ 1248 n.1 (6th Cir. 1985))). Summary judgment is to be decided on "the pleadings, depositions, answers to interrogatories, and -9- admissions on file, together with the affidavits, if any." Fed. R. Civ. P. 56(c). In addition, a court may take into account any material that would be admissible or usable at trial. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure 2721, at 40 (2d ed. ______________________________ 1983). However, inadmissible evidence may not be considered. Finn v. Consolidated Rail Corp., 782 F.2d 13, 16-17 (1st Cir. ____ _______________________ 1986). "Mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact." August v. Offices Unlimited, Inc., 981 F.2d 576, 580 ______ _______________________ (1st Cir. 1992). We need consider only one of the challenged exhibits as none of the others, even if admissible, would add to or subtract from Horta's ability to raise a genuine issue of material fact. The significant exhibit is a photocopy of a newspaper article indicating that Officer Sadeck's cruiser had arrived on the scene before the crash and was so positioned with Officer Sullivan's cruiser as to form a "staggered roadblock." This account is contrary to all the other reports before the court. Sadeck stated in his own affidavit that he was on Route 18, not on Mason Road (where the crash occurred) when he saw smoke coming from the front of Officer Sullivan's cruiser and heard Sullivan report the collision to the Freetown dispatcher. Officer Sadeck says that he immediately drove down Mason Road and parked his -10- cruiser in the westbound lane approximately 150 feet behind Officer Sullivan's cruiser, which was in the eastbound lane. He exited his car, saw two injured persons on the ground and ran back to his cruiser to summon an ambulance and obtain first aid equipment. Officers Meninno and Sullivan corroborate Sadeck's story, stating that they did not see Officer Sadeck on the scene until after the collision. Freetown Police Chief Mello's affidavit states that an official investigation of the incident turned up no evidence that Officer Sadeck was on Mason Road before the collision occurred. Appellant alleged in her complaint that Officer Sadeck was on Mason Road before the collision, and had parked his vehicle in the westbound lane, 150 feet behind Officer Sullivan's cruiser in the eastbound lane, to establish with Sullivan a staggered roadblock. The newspaper article offered in support of this appeared two days after the accident. It reports Freetown Police Chief Mello as stating that two Freetown police vehicles were positioned on Mason Road to create a staggered roadblock.8 No affidavits or  ____________________ 8. The unidentified reporter wrote, in part: James F. Demoranville, 40, died of multiple injuries at St. Luke's Hospital in New Bedford at 10 p.m., about 45 minutes after he lost control of his motorcycle and slid into one of 2 police cruisers poised to slow him down. . . . -11- depositions from the unidentified newspaper reporter or reporters were submitted to the court. This article should have been stricken on appellees' motion and cannot be considered in deciding whether Horta has raised a genuine issue of material fact. See Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. ___ _______ _______________ 1990); Bolen v. Paragon Plastics, Inc., 754 F. Supp. 221, _____ _______________________ 224-25 (D. Mass. 1990). The account is hearsay, inadmissible at trial to establish the truth of the reported facts. In fact, the newspaper account is hearsay within hearsay. See ___ Fed. R. Evid. 805. Even were appellee Chief Mello the sole source of the article's information, so that his statements could be regarded as the nonhearsay admissions of a party opponent, see Fed. R. Evid. 801(d)(2), the article itself ___ constitutes inadmissible out-of-court statements, by unidentified persons, offered to prove the truth of the  ____________________ [] Freetown police set up a partial road block by staggering two cruisers along the road, according to Police Chief Edward Mello. The staggered road block is designed to slow down speeding vehicles, leaving an opening for the vehicle to continue driving, he said. Mr. DeMoranville did slow his motorcycle but lost control of it as he tried to avoid hitting a cruiser, according to reports. The motorcycle and its passengers then slid into the front end of one of the cruisers. Chase Ends in Death, New Bedford (Mass.) Sunday Standard- _____________________ Times, Aug. 7, 1988. -12- matter asserted. See Fed. R. Evid. 801(c); New England Mut. ___ ________________ Life Ins. Co. v. Anderson, 888 F.2d 646, 650-51 (10th Cir. ______________ ________ 1989). Such inadmissible material is not a proper part of the record for summary judgment purposes. See, e.g., ___ ____ Garside, 895 F.2d at 50 (refusing to consider, on summary _______ judgment motion, an interrogatory answer describing the anticipated testimony of an expert because it contained inadmissible hearsay); FDIC v. Roldan Fonseca, 795 F.2d 1102, ____ ______________ 1110 (1st Cir. 1986) (refusing to consider on summary judgment photocopies of three money orders offered to show amount paid on a note because they were inadmissible hearsay). Accordingly, the newspaper article may not be regarded in determining whether a genuine issue of material fact exists. III. III. Appellant alleged in Count I that Officers Sadeck, Meninno, and Sullivan were liable to her under 42 U.S.C. 1983 because they deprived her of her constitutional right under the Fourth Amendment to be free from unreasonable seizures.9 In granting summary judgment for appellees, the  ____________________ 9. The Fourth Amendment to the United States Constitution provides: The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or -13- district court ruled that all three were entitled to qualified immunity. We affirm, although on different grounds as to Sadeck and Meninno. See Aunyx Corp. v. Canon U.S.A., ___ ___________ _____________ Inc., 978 F.2d 3, 6 (1st Cir. 1992) ("We are free, on appeal, ____ to affirm a judgment on any independently sufficient ground." (citations omitted)), cert. denied, 113 S. Ct. 1416 (1993). ____________ A. Officer Sadeck  A. Officer Sadeck ______________  ____________________ affirmation, and particularly describing the place to be searched, and the person or things to be seized. 42 U.S.C. 1983 provides in relevant part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . . Appellant also alleged in Count I that Sadeck, Meninno, and Sullivan were liable under 42 U.S.C. 1985. However, the 1985 claims were never discussed below, either by the parties or the court, and the record does not support a 1985 claim. See United Bhd. of Carpenters v. Scott, 463 ___ _________________________ _____ U.S. 825, 834-37 (1983) (reaffirming that 1985 requires a showing of some racial, or perhaps otherwise class-based, animus behind the conspirators' actions); Griffin v. _______ Breckenridge, 403 U.S. 88, 102-03 (1971) (explaining elements ____________ of a claim under 1985(3)). Hence, we consider Count I to include claims only under 1983. -14- Appellant's claim against Sadeck is based entirely on the allegation that he parked his vehicle on Mason Road before the collision, helping Officer Sullivan to create a staggered roadblock which led to appellant's injuries. The undisputed facts on the record show that Officer Sadeck did not arrive on Mason Road until after the accident and, therefore, was not causally connected to the injuries sustained by appellant. Consequently, Sadeck was entitled to judgment as a matter of law on the 1983 claim against him. See Lossman v. Pekarske, 707 F.2d 288, 291 (7th Cir. 1983) ___ _______ ________ ("[T]he principles of tort causation apply to constitutional as to other tort suits."). B. Officer Meninno  B. Officer Meninno _______________ We do not reach qualified immunity, the ground upon which the court below dismissed the 1983 claim against Officer Meninno. Rather, we find that Meninno is entitled to prevail as a matter of law because his conduct, construed in the light most favorable to appellant, could not have constituted a "seizure" of her person within the meaning of the Fourth Amendment. The Supreme Court, in Brower v. County of Inyo, 489 ______ ______________ U.S. 593 (1989), clarified the scope of the Fourth Amendment in the context of police pursuits and roadblocks. Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the -15- object of the detention or taking, but the detention or taking must be willful. This is implicit in the word "seizure," which can hardly be applied to an unknowing act. . . . In sum, the Fourth Amendment addresses "misuse of power," not the accidental effects of otherwise lawful government conduct. Thus, if a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amendment. And the situation would not change if the passerby happened, by lucky chance, to be a serial murderer for whom there was an outstanding arrest warrant even if, at the time he was thus pinned, he was in the process of running away from two pursuing constables. It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an _______ individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally ______________________________ applied. That is the reason there was no _______ seizure in the hypothetical situation that concerned the Court of Appeals. [I.e., a police chase in which the suspect unexpectedly loses control of his car and crashes.] The pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit; and though he was in fact stopped, he was stopped by a different means his loss of control of his vehicle and the subsequent crash. If, instead of that, the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure. -16- Id. at 596-97 (citations omitted) (emphasis in original). ___ Applying the Court's reasoning in Brower to the ______ present facts, it is clear that Officer Meninno's pursuit of the motorcycle on which Horta was riding, without more, was not a Fourth Amendment seizure. "A Fourth Amendment seizure does not occur when a police officer turns on his blue lights and thereby signals the driver of a vehicle to pull over." Willhauck v. Halpin, 953 F.2d 689, 716 (1st Cir. 1991). If _________ ______ the driver speeds off, pursued by the officer, and a crash ensues, this does not necessarily constitute a seizure, either. Hence, if during the chase here Demoranville's motorcycle had accidentally collided with a tree on Mason Road there would plainly have been no seizure, as Meninno would not have terminated Horta's "freedom of movement through means intentionally applied," (i.e., Meninno did not ___________________________________ intentionally cause the motorcycle to strike the tree). Brower, 489 U.S. at 597; see, e.g., Campbell v. White, 916 ______ ___ ____ ________ _____ F.2d 421, 423 (7th Cir. 1990) (holding no seizure occurred where police officer accidentally collided with motorcyclist being pursued), cert. denied, 111 S. Ct. 1314 (1991); Apodaca ____________ _______ v. Rio Arriba County Sheriff's Dept., 905 F.2d 1445, 1447 ___________________________________ (10th Cir. 1990) (holding no seizure occurred where police officer responding to burglar alarm unintentionally collided with bystander's vehicle); Roach v. City of Fredericktown, _____ ______________________ 882 F.2d 294, 296 (8th Cir. 1989) (holding no seizure -17- occurred where police officer did not intend pursuit to end by means of a collision with another vehicle). By the same token, it is not sufficient that Meninno pursued and the pursuit resulted in a collision with another police vehicle. Even if Officer Sullivan's independent conduct in blocking the lane were deemed to be a Fourth Amendment seizure, see infra Part III.C., Officer __________ Meninno did not necessarily share responsibility. "The Supreme Court in Brower carefully distinguished between ______ police action directed toward producing a particular result _______________ in Fourth Amendment parlance, 'an intentional acquisition of physical control' and police action that simply causes ______ a particular result. Unless the restraint of liberty at issue resulted from an attempt to gain control of the individual, the Court stated, there has been no Fourth Amendment seizure." Landol-Rivera v. Cruz Cosme, 906 F.2d _____________ __________ 791, 795 (1st Cir. 1990) (emphasis in original). To establish that Meninno seized her, appellant must show that the collision with Officer Sullivan's cruiser was the means intended by Meninno to end the pursuit.  ___________________ Reading the record in the light most favorable to appellant, there is no basis for a jury to find that a collision between the motorcycle and another police vehicle was the means intended by Meninno to terminate the pursuit. Meninno himself attempted to stop the motorcycle only by a -18- show of authority, i.e., his flashing lights and siren. He did not request the Lakeville police to establish a partial roadblock, nor is there anything to show that he contemplated forcing the fleeing motorcycle into a collision. Appellant asserts that Meninno intentionally brought about the collision by "herding" the motorcycle into Sullivan's cruiser. But Meninno's cruiser did not touch the motorcycle; he consistently matched his speed to that of the motorcycle and maintained a distance of a few hundred feet behind. Demoranville slowed down (to thirty miles per hour) and sped up (to seventy-five miles per hour) a number of times during the chase. Nothing prevented the motorcycle operator from slowing down and stopping had he so desired. It was Demoranville, not Meninno, who elected to head into Freetown and to turn onto Mason Road. Meninno, moreover, never proposed nor discussed with anyone the idea of blocking the traffic lane. Officer Sullivan volunteered his assistance, and Officer Meninno, though in radio contact with Sullivan, had no authority over him. Sullivan's decision to park his car in the oncoming traffic lane of Mason Road was made independently and, until just before the crash, without Meninno's knowledge. Meninno was first informed, by radio, of the partial roadblock when Officer Sullivan told him to "back off," approximately -19- fifteen seconds before the collision. Meninno said that he did slow down, although the motorcycle kept going. We hold that appellant did not produce facts creating a genuine issue as to whether the motorcycle-police cruiser collision was the means intended by Officer Meninno to terminate appellant's freedom of movement.10 Appellee Meninno was entitled to summary judgment on Count I. C. Officer Sullivan  C. Officer Sullivan ________________ The district court found appellee Sullivan to be protected by qualified immunity from appellant's 1983 claim. Appellant challenges the finding of qualified immunity, first arguing that Sullivan was not engaged in a "discretionary function" when he participated in the pursuit of appellant and Demoranville. His actions were not discretionary, she argues, because the Town of Freetown had in effect high speed guidelines which governed his conduct. In its landmark case establishing qualified immunity doctrine, the Supreme Court indeed stated that "government officials performing discretionary functions, ________________________ generally are shielded from liability for civil damages  ____________________ 10. We do not consider to what extent, if any, appellant's claim of a Fourth Amendment seizure is weakened by her status as a mere passenger on the motorcycle, not the motorcycle operator being pursued by the police for violation of traffic laws. See Landol-Rivera v. Cruz Cosme, 906 F.2d 791, 795-96 ___ _____________ __________ (1st Cir. 1990). -20- insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. ______ __________ 800, 818 (1982) (emphasis supplied). But in spite of the reference to discretionary functions, it has never since been clear exactly what role, if any, this concept is supposed to play in applying qualified immunity. Judge Cummings, writing for the Seventh Circuit, warned that "it would be unwise to engage in a case by case determination of Section 1983 immunity based upon the ministerial versus discretionary nature of the particular official act challenged." Coleman v. Frantz, 754 F.2d 719, 727 (7th Cir. _______ ______ 1985). Judge Arnold, writing for the Eighth Circuit, said, The distinction between ministerial and discretionary duties of public officials has a long history. However, the plaintiffs have cited, and we can find, no recent case other than that before us in which a court has rejected qualified immunity simply because the official in question was performing a ministerial duty. McIntosh v. Weinberger, 810 F.2d 1411, 1432 (8th Cir. 1987) ________ __________ (citations omitted), partially vacated and remanded on other ________________________________________ grounds sub nom. Turner v. McIntosh, 487 U.S. 1212 and cert. ________________ ______ ________ ___ _____ denied, 487 U.S. 1217 (1988). See Gagne v. City of ______ ___ _____ ________ Galveston, 805 F.2d 558, 559 (5th Cir. 1986) (holding that _________ officials do not lose qualified immunity merely because their conduct violates some unambiguous statutory or administrative -21- provision), cert. denied, 483 U.S. 1021 (1987); see also F.E. ____________ ________ ____ Trotter, Inc. v. Watkins, 869 F.2d 1312, 1314-15 (9th Cir. ______________ _______ 1989); cf. Ricci v. Key Bancshares of Maine, Inc., 768 F.2d __ _____ _____________________________ 456, 464 (1st Cir. 1985) ("[B]reaking down discretionary acts . . . into discretionary and ministerial components would seem to vitiate much of the protection of discretionary action which absolute immunity was designed to provide."). Since Harlow the Supreme Court has neither ______ repudiated nor much explained the role of discretionary functions relative to qualified immunity. However, in Davis _____ v. Scherer, 468 U.S. 183 (1984), the Court rejected an _______ argument almost identical to the one put to us here. Officials being sued for alleged constitutional violations were accused of having ignored the commands of state administrative regulations, and hence of violating a ministerial rather than a discretionary duty. Id. at 193, ___ 196 & n.14. Because of this, it was argued that they had forfeited any claim to qualified immunity. In rejecting this contention, the Court made two points: first, the officials could lose their immunity only if the breach of the state regulation rather than of a constitutional duty gave rise to plaintiff's damages claim; and, second, the officials' duties were not merely ministerial, as the officials retained a considerable measure of personal discretion in applying the administrative regulations. Id. at 196 & n.14. ___ -22- The same factors bar appellant's claim here. The damages claim in Count I is based on a purported Fourth Amendment violation, not upon the breach of the Freetown high speed pursuit guidelines. And the pursuit guidelines required Sullivan to exercise discretion in their interpretation.11 Generally, police exercise "inescapably discretionary functions replete with close judgment calls." Gooden v. Howard County, 954 F.2d 960, 964 (4th Cir. 1992) ______ _____________ (en banc). The promulgation by a police department of general guidelines and standard procedures does not transform police officers' discretionary actions into ministerial ones. "A law that fails to specify the precise action that the official must take in each instance creates only discretionary authority . . . ." Davis v. Scherer, 468 U.S. _____ _______ at 197 n.14. The Freetown guidelines, an eight-page collection of rules and suggestions labeled "High Speed  ____________________ 11. Confusingly, appellant also argues at some points in her brief that Freetown did not have guidelines in place, citing ___ three documents from Freetown public records which suggest that a new set of high speed pursuit guidelines were adopted in late 1988, after the collision. These documents, however, are not inconsistent with the uncontradicted statements by appellees Sullivan and Mello that written guidelines were in effect on August 5, 1988. It would weaken and not help appellant's position were it to be found that no guidelines existed governing Sullivan's actions. With no rules or regulations to guide his decision making, Sullivan's decision to aid in the pursuit and block off the lane would necessarily have been discretionary. -23- Pursuit General Considerations and Guidelines," left Sullivan with a substantial amount of discretion as to when and how to conduct and terminate high speed pursuits. We conclude that insofar as the concept of discretionary function is relevant at all in the immunity sphere, Sullivan was engaged in a discretionary function. The more serious question under Harlow is whether ______ Sullivan violated a clearly established statutory or constitutional right of which a reasonable police officer would have known. The theory of appellant's 1983 claim is that Sullivan violated her rights under the Fourth Amendment to be free from unreasonable seizures by placing his police car in the traffic lane in which he knew appellant and Demoranville were traveling at high speed. Appellant argues that a reasonable police officer would have known that, under clearly established law, this sort of a partial roadblock was unlawful. Appellant has the burden of demonstrating that the law on this issue was clearly established on August 5, 1988. Davis, 468 U.S. at 197. For a right to be clearly _____ established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). While ________ _________ appellant need not show that "the very action in question has -24- previously been held unlawful," she must show that, in the light of preexisting law, the unlawfulness of the action would have been apparent to the reasonable police officer. Id.  ___ The Supreme Court required "any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment . . . [to] take into account '"all of the circumstances surrounding the incident"' in each individual case." Michigan v. Chesternut, 486 U.S. 567, 572 (1988) ________ __________ (citations omitted). There must be a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Tennessee v. Garner, 471 U.S. 1, 8 (1985) (citations _________ ______ omitted). "[W]henever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under Harlow." Benson v. Allphin, 786 F.2d 268, ______ ______ _______ 276 (7th Cir.), cert. denied, 479 U.S. 848 (1986); see Medina ____________ ___ ______ v. City of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992); _______________ Frazier v. Bailey, 957 F.2d 920, 931 (1st Cir. 1992). _______ ______ Consequently, appellant here must demonstrate that, by the time in question, there were fairly analogous precedents establishing that Sullivan's conduct violated a plaintiff's Fourth Amendment right to be free from unreasonable seizures. -25- The hodgepodge of cases cited by appellant12 show the opposite: it was not at all clear at the time that Sullivan's actions violated a person's Fourth Amendment rights. As discussed below, Brower v. County of Inyo, 489 ______ _______________ U.S. 593 (1989), holding that a total roadblock (i.e., _____ tractor trailer placed broadside across entire road) was a seizure, was not decided until seven months after the present events had occurred. The strongest case decided prior to this incident in appellant's favor was Jamieson v. Shaw, 772 ________ ____ F.2d 1205 (5th Cir. 1985), in which the plaintiff was seriously injured when the car in which she was a passenger struck a "deadman's" roadblock placed across a highway by defendant police officers. Id. at 1206. "The roadblock ___ consisted of an unlighted police car parked laterally in the  ____________________ 12. We have considered all of the cases cited by appellant and discuss only the ones which best support her argument that Sullivan violated clearly established Fourth Amendment rights. Appellant cites one decision from Texas which found the use of an unlit, total roadblock to stop speeding motorcycles to be an unconstitutional excessive use of force. See City ___ ____ of Amarillo v. Langley, 651 S.W.2d 906, 913-14 (Tex. Ct. App. ___________ _______ 7th Dist. 1983). The Langley court did not discuss the _______ Fourth Amendment. As far as we can tell, appellant has not alleged that Sullivan violated her substantive due process rights to be free from excessive force. Even if she had, the Supreme Court made clear in Graham v. Connor, 490 U.S. 386 ______ ______ (1989), that where "the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment . . . ." Id. at 394; see ___ ___ Landol-Rivera v. Cruz Cosme, 906 F.2d 791, 796 (1st Cir. _____________ ___________ 1990). -26- middle of the highway just over the crest of a hill. Just as [the pursued] car, still traveling at a high rate of speed, reached the top of the hill, [a police officer] flashed a bright spotlight in [the driver's] eyes, blinding him momentarily and causing him to lose control of the car and crash into the roadblock." Id. at 1207. The Jamieson court ___ ________ held that plaintiff's complaint stated a claim cognizable under the Fourth Amendment, but did not resolve whether, under the circumstances, the police officers' actions actually constituted an unreasonable seizure. Id. at 1211; ___ see also Stanulonis v. Marzec, 649 F. Supp. 1536, 1545 (D. _________ __________ ______ Conn. 1986) (holding that creating "an immediate risk of a collision" by placing police car in path of speeding vehicle could constitute use of excessive force). In direct contrast to Jamieson, the Ninth Circuit ________ decided in 1987 that such a total roadblock was not a Fourth Amendment violation. See Brower v. County of Inyo, 817 F.2d ___ ______ ______________ 540 (9th Cir. 1987), rev'd, 489 U.S. 593 (1989). After _____ pursuing a suspect at high speeds for twenty miles, the defendant police officers decided to create a roadblock to stop him. Id., 817 F.2d at 542. A tractor-trailer truck was ___ placed across the highway to block both lanes of the two-lane highway. Id. Plaintiffs alleged that the police concealed ___ the roadblock by placing it behind a curve and leaving it unilluminated. Brower, 489 U.S. at 594. The police then ______ -27- positioned a police car in front of the tractor trailer with its headlights purposely aimed to blind the suspect as he approached the unlit roadblock. Id. ___ The Ninth Circuit held that use of this roadblock did not implicate the Fourth Amendment. Although Brower was stopped in the literal sense by his impact with the roadblock, he was not 'seized' by the police in the constitutional sense. Prior to his failure to stop voluntarily, his freedom of movement was never arrested or restrained. He had a number of opportunities to stop his automobile prior to the impact. An analogous situation arose in Galas [v. McKee, 801 F.2d 200 (6th Cir. _____ _____ 1986)] where a police officer engaged in a high-speed chase of a fleeing traffic offender. The chase ended when the fleeing driver lost control and crashed. The question arose whether the crash was a "seizure" under the fourth amendment. The court concluded that there had been no seizure by the police because the officers had failed to impose restraint on the individual's freedom to stop or drive away. . . . We agree with the Galas decision. _____ In this case, as the twenty-mile chase makes plain, Brower consciously chose to avoid official restraint. That decision, an exercise of autonomy, cannot fairly be viewed as a "seizure" by the police, under the fourth amendment. Brower's seizure, if any, was the result of his own effort in avoiding numerous opportunities to stop. Brower, 817 F.2d at 546; see also Reed v. County of Allegan, ______ ________ ____ __________________ 688 F. Supp. 1239, 1243 (W.D. Mich. 1988) (applying the Ninth -28- Circuit's Brower decision to hold that use of a roadblock did ______ not constitute a seizure). The Supreme Court subsequently reversed the Ninth Circuit's decision in Brower, holding that a "seizure" within ______ the meaning of the Fourth Amendment had occurred, and remanded the case for a finding as to whether the seizure was "unreasonable." Brower v. County of Inyo, 489 U.S. at 599- ______ ______________ 600. However, as we have stated, the Supreme Court's decision in Brower was issued in March of 1989, seven months ______ after the Mason Road incident.13 _____ Where at the time of the present occurrence there were conflicting circuit decisions as to whether or not even the more deadly full roadblocks were unconstitutional, ____ Sullivan's parking of his illuminated cruiser in one lane of a straightaway cannot be said to have violated clearly established rights. Appellant argues that it had been clearly established in Tennessee v. Garner, 471 U.S. 1 (1985), that _________ ______ the use of deadly force to seize an unarmed, nondangerous suspect violates the Fourth Amendment, id. at 11. According ___ to appellant, a reasonable police officer would have analogized the use of the present roadblock to the  ____________________ 13. Appellant suggests that a reasonable police officer would have realized that the Ninth Circuit's decision in Brower was incorrect because the Supreme Court had already ______ granted certiorari on August 5, 1988. Clairvoyance is not a prerequisite for qualified immunity. -29- intentional shooting of a fleeing suspect. However, Tennessee v. Garner applied only to "seizures" and it was not _________ ______ yet clear that a stopping by a roadblock might, in appropriate circumstances, be a seizure. Id. at 7; Brower, ___ ______ 817 F.2d at 546; Fernandez v. Leonard, 784 F.2d 1209, 1217 _________ _______ (1st Cir. 1986). Four years elapsed before the Supreme Court held in Brower that a roadblock could be a "seizure." During ______ this period the Ninth Circuit rejected the argument that a roadblock fell into the "seizure" category. See Brower, 817 ___ ______ F.2d at 546-47 (distinguishing Tennessee v. Garner on the _________ ______ grounds that use of a roadblock is not a seizure). Nor was it clear to all federal courts that a successful roadblock or high speed pursuit ending in a crash constituted the "use of deadly force." Compare Reed v. County of Allegan, 688 F. _______ ____ __________________ Supp. at 1243 (holding that a roadblock does not constitute use of deadly force) with Moyer v. Dunn County, 691 F. Supp. ____ _____ ___________ 164, 170-71 (W.D. Wis. 1988) (suggesting that high speed pursuit of suspect resulting in collision with police car or off-road crash could constitute use of deadly force). As it stood at the time this tragic accident occurred, the law was not so clear that a reasonable police officer would know that establishing an illuminated, partial roadblock at the end of a straightaway violated Fourth Amendment rights. Because Sullivan did not violate a clearly established right of appellant's, the district court -30- correctly found that he was entitled to qualified immunity from a claim under 42 U.S.C. 1983. In holding that Sullivan is entitled to qualified immunity, we do not mean to imply that on the present showing, there would otherwise necessarily be a triable issue concerning whether or not this partial roadblock amounted to a seizure under the Fourth Amendment. We need not reach that question. It may be that the illuminated blocking of a single lane at a point some distance from where the block could be seen by the pursued vehicle would not amount to a seizure. On the other hand, the converse can be argued. See ___ Brower, 489 U.S. at 598-99. We leave that issue for another ______ day. What is abundantly clear is that, on the law existing at the time of the events in question, a reasonable police officer would not have known that the partial block in question violated the Fourth Amendment. -31- IV. IV. In Count IV, appellant alleged that the Town of Lakeville and Town of Freetown are liable under the Massachusetts Tort Claims Act, Mass. Gen. L. ch. 258, 1 et __ seq., for the allegedly negligent actions of Officers Meninno ____ and Sullivan, respectively.14 A public employer's liability for the negligence of its employees is created by section 2 of Chapter 258, which provides in relevant part: Public employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances, . . . . Mass. Gen. L. ch. 258, 2. The liability of a public employer under section 2 is subject to several exceptions, including the "discretionary function" exception found in Mass. Gen. L. ch. 258, 10(b): The provisions of sections one to eight, inclusive, shall not apply to: (a) . . . (b) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary  ____________________ 14. Appellant also alleged that Freetown was liable for the negligence of the third police officer, Sadeck. However, as explained in Part III.A., there is nothing in the record to support a finding that Sadeck was in any way involved in the pursuit and collision which injured appellant. His actions are not actionable under Mass. Gen. L. ch. 258, 2. -32- function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused; . . . . Mass. Gen. L. ch. 258, 10. We agree with appellant that the district court erred in reasoning that because the police officers' actions were "discretionary" for the purposes of qualified immunity under federal law, they were also performing "discretionary functions" for the purposes of the 10(b) exception. As we have already explained, supra, it would be the rare case _____ indeed where an officer is denied qualified immunity because the officer is found to have engaged in "ministerial" rather than "discretionary" conduct. The discretionary function exception in both the Massachusetts and the Federal Torts Claims acts is altogether different from whatever narrow exception may still exist under immunity law for nondiscretionary ("ministerial") conduct. "Because of the limitation of the [ 10(b)] exemption to conduct that is policymaking or planning, the words 'discretionary function' are somewhat misleading as a name of the concept." Harry _____ Stoller & Co. v. City of Lowell, 412 Mass. 139, 587 N.E.2d _____________ ______________ 780, 783 (1992) (hereinafter Stoller). The proper approach _______ is to apply Massachusetts law on the discretionary function exception to appellant's Massachusetts Tort Claims Act claims against Lakeville and Freetown. -33- After extensive consideration of Massachusetts case law on the discretionary function exception, we are unable to determine whether the exception applies to the actions of Officer Meninno. Because answering that question implicates important policy questions under Massachusetts state law, we certify the question to the Supreme Judicial Court of Massachusetts. As for the liability of Freetown for the actions of Officer Sullivan, we find in Section B infra that _____ the district court prematurely granted summary judgment for Freetown because there is a genuine issue of material fact regarding Sullivan's discretion to engage in the allegedly tortious conduct. A. Liability of Lakeville for Meninno's Conduct A. Liability of Lakeville for Meninno's Conduct ____________________________________________ 1. Discretionary Function Exception Doctrine 1. Discretionary Function Exception Doctrine ______________________________________________ Appellee Lakeville argues that it is immune from liability under the Massachusetts Tort Claims Act because Meninno's conduct falls within the discretionary function exception of section 10(b), Mass. Gen. L. ch. 258, 10(b). The discretionary function exception was first introduced in Massachusetts in Whitney v. Worcester, 373 Mass. 208, 366 _______ _________ N.E.2d 1210 (1977), which preceded enactment of section 10(b). The Whitney court distinguished immune from nonimmune _______ conduct by drawing a dividing line "between those functions which rest on the exercise of judgment and discretion and represent planning and policymaking and those functions which -34- involve the implementation and execution of such governmental policy or planning." Id., 366 N.E.2d at 1216. Massachusetts ___ courts still rely on the analysis in Whitney as containing _______ "guiding principles for determining the scope of the discretionary function exception." Stoller, 587 N.E.2d at _______ 783. Massachusetts courts also look for guidance to federal court decisions interpreting the discretionary function exception of the Federal Torts Claims Act ("FTCA"), 28 U.S.C. 2680(a). Id. After the Massachusetts legislature adopted ___ section 10(b), the test for whether particular conduct is within the exception evolved over the years as the courts confronted the application of the exception to various fact scenarios. Like the federal discretionary function exception, see id., the Massachusetts doctrine has not always ___ ___ developed along a straight and clear line. Compare Cady v. _______ ____ Plymouth-Carver Regional Sch. Dist., 17 Mass. App. Ct. 211, ____________________________________ 457 N.E.2d 294 (1983) (holding that a function is discretionary if there is no "fixed or readily ascertainable standards to fall back upon") and Kelley v. Rossi, 395 Mass. ___ ______ _____ 659, 481 N.E.2d 1340, 1344 n.6 (1985) (using the "fixed or readily ascertainable standard" test of Cady) and A.L. v. ____ ___ ____ Commonwealth, 402 Mass. 234, 521 N.E.2d 1017, 1024 (1988) ____________ (same) with Stoller, 587 N.E.2d at 784 n.2 (criticizing Cady ____ _______ ____ test and asserting that the S.J.C. had never adopted it). -35- For years, courts relied upon a distinction between activities that occur at the "planning" and "operational" levels of government to decide whether certain conduct is immune from liability. See Patrazza v. Commonwealth, 398 ___ ________ ____________ Mass. 464, 497 N.E.2d 271, 274 (1986). The Supreme Court questioned this distinction in United States v. S.A. Empresa _____________ ____________ de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797 _______________________________________________ (1984), and recently in United States v. Gaubert, 111 S. Ct. _____________ _______ 1267 (1992), the Court expressly rejected the planning- operational distinction. A discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policymaking or planning functions. Day-to-day management of banking affairs, like the management of other businesses, regularly require judgment as to which of a range of permissible courses is the wisest. Discretionary conduct is not confined to the policy or planning level. "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." Varig Airlines, [] at 813, 104 S. ______________ Ct., at 2764. Gaubert at 1267. Whether an official's duties primarily _______ involve operations and administration as opposed to planning is irrelevant because "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." Varig Airlines, 467 U.S. at 813; see Attallah v. United ______________ ___ ________ ______ States, 955 F.2d 776, 783 (1st Cir. 1992). The Court instead ______ -36- articulated a two-part test, developed in Varig Airlines and ______________ Berkovitz v. United States, 486 U.S. 531 (1988). The FTCA _________ _____________ discretionary function exception applies if, (1) the act involved an element of judgment or choice, and, (2) the action or decision was based on considerations of public policy. Gaubert at 1273-74. _______ The Massachusetts Supreme Judicial Court cited Gaubert with approval in Stoller, its most recent decision _______ _______ construing section 10(b), and apparently adopted much of its reasoning. The S.J.C. rejected the planning-operational distinction, writing that, "[e]ven decisions made at the operational level, as opposed to those made at the policy or planning level, would involve conduct immunized by the discretionary function exception if the conduct were the result of policy determinations." Stoller, 587 N.E.2d at 784 _______ (citing Gaubert). Stoller held that the proper test is: (1) _______ _______ whether the governmental actor had discretion as to what course of conduct to follow, and (2) whether the discretionary conduct involves policymaking or planning. Id. ___ at 782-83. If both elements are present, then the discretionary function exception applies. 2. Application of Stoller Test to Meninno's Conduct 2. Application of Stoller Test to Meninno's Conduct ________________________________________________ To apply the two-part test here, we first must define what conduct or course of action taken by Officer Meninno appellant claims was negligent. She does not allege that her -37- injury came about because Meninno operated his vehicle in a negligent manner while pursuing the motorcycle. Compare _______ Gaubert, 111 S. Ct. at 1275 n.7 ("If one of the officials _______ involved in this [bank regulation] case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply."). Instead, she apparently claims that Meninno's decision to keep pursuing the motorcycle for 3.2 miles after ________ it failed to stop was negligent.15 She proposes to show at trial that a reasonable police officer would not have persisted in such a pursuit under the circumstances. The first element of the discretionary function test set out in Stoller is whether Meninno "had any _______ discretion at all as to what course of conduct to follow." Stoller, 587 N.E.2d at 782. A governmental actor has no _______ discretion if "a course of action was prescribed by a statute, regulation, or established agency practice." Id. ___ Appellant concedes in her brief that, under the Lakeville "High Speed Pursuit General Considerations and Guidelines," Meninno had discretion to make the final decision to pursue at high speed, but argues that the guidelines completely regulate the manner in which an officer conducts a pursuit,  ____________________ 15. As discussed in Part III.B. supra, appellant also _____ alleged that Meninno "herded" the motorcycle into Sullivan's parked vehicle. Nothing in the record supports this allegation. -38- leaving Meninno no discretion to make policy judgments and mandating his every move. We find this argument unpersuasive. Whether Meninno properly weighed the guideline factors in deciding to pursue is perhaps open to debate,16 but if as appellant  ____________________ 16. The first pages of the guidelines explain the general policy of Lakeville regarding high speed pursuits: As a general statement, high speed pursuit is not recommended or favored. This is because the potential danger to the officer and the general public outweighs the potential advantage of apprehending a fleeing vehicle by such means. Stated simply, pursuit is clearly inappropriate when the pursuit itself endangers life more than the escape of the person pursued. Delay, while distasteful, may be the wiser choice when the person is known and he or she poses no immediate threat to the community. Under certain circumstances, however, continuous high speed pursuit may be authorized. When such pursuit is undertaken, the purpose should be to apprehend quickly and safely. . . . When the pursuit would be authorized, each officer must use his discretion in determining whether or not to commence a chase. Many factors should have a bearing on his choice, but some of the major ones may be listed: 1. road conditions; 2. traffic conditions; 3. time of day; 4. type of vehicle involved; 5. nature of the offense. Once made, the decision to pursue is not irrevocable, and it is the intelligent officer who knows when to -39- has conceded the call was within his authority to make, the existence of rules governing the manner of the chase did not remove his discretion. These rules forbade certain conduct, such as pursuing while nonpolice personnel are in the police cruiser; and they mandate other conduct, like wearing a seat belt. The crucial decisions, however including whether and when to begin a pursuit, what speed to maintain during it, how close to tail the pursued vehicle, and how and when to terminate the pursuit are left to the officer's discretion.17 For example, the only guideline that speaks to the question of when to stop pursuing a vehicle states: "[T]he officer in pursuit shall voluntarily abandon pursuit when he determines that conditions of the  ____________________ discontinue the chase. Briefly, and as a general rule of thumb, it is often better to abandon the pursuit where the risk of danger to himself or to the public is high or weather or road conditions are poor. The experience and common sense of each officer should also guide him in his decision. 17. Horta also points to the following guideline provision: "[A] continuing high speed pursuit . . . is authorized, but only when the pursuing officer . . . has reasonable grounds to arrest the person pursued for a serious felony . . . or when the vehicle being pursued is being operated in such a manner as to endanger the public." Horta argues that there was no evidence of a prior felony. However, Meninno was entitled to determine that the motorcycle was endangering public safety. In his deposition, Meninno testified that the motorcycle veered into the oncoming lane at times and, at one point, drove close to a group of pedestrians on the roadside, causing them to jump back. In his opinion, the motorcycle driver was intoxicated. -40- road, weather, traffic or other factors necessitates [sic] abandonment." This, like the other guidelines, is not a strict rule prescribing certain conduct. Assuming Meninno had discretion to determine whether or not to pursue, we can find nothing in the regulations that removed that discretion on the facts of this case. Accordingly, Meninno had the requisite discretion prescribed in Stoller. _______ "The second and far more difficult step is to determine whether the discretion that the actor had is the kind of discretion for which section 10(b) provides immunity from liability." Stoller, 587 N.E.2d at 782. The _______ discretionary function exception, under both the Massachusetts Tort Claims Act and the Federal Tort Claims Act, provides immunity only for discretionary "conduct that involves policymaking or planning." Id. at 783. The ___ question is not whether the employee worked at a "planning" or "operational" level, but whether the type of decision or action at issue, by whatever level employee, is one based on considerations of governmental policy. Id. at 784; see also ___ ___ ____ Gaubert, 111 S. Ct. at 1275-76; Varig Airlines, 467 U.S. at _______ ______________ 813. Not only broad, abstract decisions of policy are immune. Discretionary functions include specific, individual applications of policy, "those [decisions] in which a government official determines what action to take based on an individual, case-by-case analysis and in which his -41- decision includes elements of judgment and discretion." Pina ____ v. Commonwealth, 400 Mass. 408, 510 N.E.2d 253, 257 (1987) ____________ (quoting Bartel v. Federal Aviation Admin., 617 F. Supp. 190, ______ _______________________ 196 n.29 (D.D.C. 1985)); Patrazza, 497 N.E.2d at 274. ________ This is obviously not a bright-line rule, and a court must assess cases on their facts, keeping in mind the purposes of the discretionary function exception. Stoller, _______ 587 N.E.2d at 783. Only discretionary acts and decisions based on considerations of public policy are exempted because "the purpose of the exception is to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" Gaubert, 111 S. Ct. at _______ 1273 (quoting Varig Airlines, 467 U.S. at 814). Thus, "[i]f ______________ the injury-producing conduct was an integral part of government policymaking or planning, if the imposition of liability might jeopardize the quality of the governmental process, or if the case could not be decided without usurping the power and responsibility of either the legislative or executive branch of government, governmental immunity would probably attach." Stoller, 587 N.E.2d at 783 (citing _______ Whitney, 366 N.E.2d at 1217). If none of these factors are _______ present, the general rule is one of no governmental immunity. Whitney, 366 N.E.2d at 1217. _______ -42- Applying the above principles to the facts of this case, without regard for the particular result of the Stoller _______ case, see infra, it can be forcefully contended that ___ _____ Meninno's decisions were of the type based on policy considerations. Clearly, the Commonwealth has a policy for enforcement of the laws by constables and police officers. The Lakeville police department and its officers are charged by the Legislature with the duty to enforce the laws, see 41 ___ M.G.L.A. 98, within the limits imposed by the federal and state constitutions and the legislature. Police chiefs are authorized to promulgate regulations for their officers in furtherance of these duties. See 41 M.G.L.A. 97A. ___ Lakeville adopted guidelines that allow Lakeville police officers to conduct and participate in high speed pursuits when, in their judgment, the benefit of apprehension outweighs the risk to public safety. See also 41 M.G.L.A.  ___ ____ 98A (authorizing police to arrest suspects "on fresh and continued pursuit" in other jurisdictions). Acting within discretion conferred by the guidelines, Meninno decided that the best way to fulfill his duty to enforce the law here was to pursue a violator who had refused to obey his signal to pull over. Surely, such a decision was based on policy considerations. Compare Irwin v. Town of Ware, 392 Mass. _______ _____ _____________ 745, 467 N.E.2d 1292, 1299 (1984) (holding that police officer was not performing discretionary function in -43- releasing known drunk driver because he acted contrary to established policy); Gaubert, 111 S. Ct. at 1275 n.7 (in _______ hypothetical, negligent driving by bank regulator has no connection to regulatory policy of banking agency). Appellant clearly could not argue that the Lakeville police department's adoption of the pursuit guidelines was itself a negligent act for which it is liable. See Patrazza, 497 N.E.2d at 274 & n.3. That legitimately ___ ________ adopted policy required Meninno to exercise his own judgment, under the particular circumstances of each incident, as to how best to fulfill the policy's dual goals of apprehending lawbreakers and protecting public safety. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's ___________________ acts are grounded in policy when exercising that discretion." Gaubert, 111 S. Ct. at 1274 (emphasis added). Thus, under _______ the Gaubert analysis, it would be presumed that Meninno's _______ actions were grounded in policy. This presumption prevails unless the plaintiff points to facts in the record "which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." Id. at 1275. Plaintiff has pointed to nothing that ___ would support a finding that the allegedly negligent -44- decisions of Meninno are not the kind of conduct that can be said to be grounded in policy. For example, she does not allege that Meninno accidentally lost control of his vehicle and hit the motorcycle, or that he acted for some ulterior purpose. Therefore, if the rules laid out in Gaubert apply _______ in Massachusetts, it would seem that Meninno's conduct was within the section 10(b) exception. 3. Purposes of Discretionary Function Exception As 3. Purposes of Discretionary Function Exception ____________________________________________ mentioned above, Massachusetts law also requires a court to consider whether the purposes of the discretionary function exception are fulfilled by including the alleged conduct within the scope of the section 10(b) exception. Making that judgment here is difficult. In favor of Lakeville, one could argue that "the imposition of liability might jeopardize the quality of the governmental process." Stoller, 587 N.E.2d at 783. If _______ suspects and their accomplices can sue towns for the strategic decisions of police officers during attempts to apprehend them, then towns especially those with financial difficulties already will have a strong incentive to avoid pursuing suspected and known lawbreakers. If the otherwise legitimate enforcement of laws is chilled by fear of liability, all types of criminals, not only traffic violators, would be able to more easily avoid apprehension and prosecution. Police departments would be hampered in -45- their ability to control crime and fulfill their statutory duty to enforce the laws of the Commonwealth. In addition, one could argue, "the case could not be decided without usurping the power and responsibility of [] the . . . executive branch of government." By permitting judges and juries to pass on the strategies used by the police (assuming they do not violate constitutional norms), the power of police departments to fulfill their statutory duty to enforce the law could be usurped. The state legislature could have, but did not, impose limits on the police power to pursue suspects. See 41 M.G.L.A. 98A ___ (authorizing police to arrest suspects "on fresh and continued pursuit" in other jurisdictions without restriction on the means of pursuit); compare Irwin, 467 N.E.2d at 1299, _______ _____ 1302 (finding that legislature imposed duty on police to take all suspected drunk drivers into custody). "Other relevant considerations are the reasonable expectations of the injured person with respect to his relationship to the governmental entity in question, the nature of the duty running from the government to the governed in the particular case, and the nature of the injury." Whitney, 366 N.E.2d at 1217. It would be difficult _______ for Horta to argue that she, as a passenger on a vehicle attempting to evade police pursuit, reasonably expected the -46- police to avoid all potentially risky attempts to capture her and her companion. On the other hand, appellant could argue with some persuasiveness that the injury-producing conduct was not "an integral part of governmental policymaking or planning." This consideration may refer to general, legislative-type decisions as opposed to administrative or operational tasks. See Dobos v. Driscoll, 404 Mass. 634, 537 N.E.2d 558, 568, ___ _____ ________ cert. denied, 493 U.S. 850 (1989); Pina, 510 N.E.2d at 256. ____________ ____ Moreover, appellant has no adequate alternative remedy for her injuries, Whitney, 366 N.E.2d at 1217, except perhaps to _______ sue the estate of the motorcycle operator. Hence, it is unclear whether the purposes of the discretionary function exception are advanced by immunizing Lakeville here. Nonetheless, not all the Whitney _______ considerations must point to immunity for the exception to apply. See, e.g., Pina, 510 N.E.2d at 256. ___ ____ ____ 4. Comparison of Analogous Massachusetts and 4. Comparison of Analogous Massachusetts and _______________________________________________ Federal Cases There is no Massachusetts case precisely on Federal Cases _____________ point, and the few cases cited by appellant provide little guidance. In Irwin v. Town of Ware, the court held that "the _____ ____________ decision of a police officer [not] to remove from the roadways a driver who he knows or has reason to know is intoxicated" is not a discretionary act within the meaning of section 10(b). Id., 467 N.E.2d at 1298. Unlike here, ___ -47- however, the court in Irwin expressly found that the police _____ officer, once he knew or had reason to know that the driver he stopped was intoxicated, had no policy-based discretion to permit the driver to go back on the road. Id. at 1299. The ___ Irwin court interpreted several state statutes as obligating _____ __________ police officers to remove known intoxicated drivers from the roads, determining that the officer's decision not to remove ___ a drunk driver could not have been based on policy considerations because "the policy and planning decision to remove such drivers has already been made by the Legislature." Id. As discussed above, Meninno was not ___ obligated by statute or regulation to take or refrain from taking the actions at issue. Instead, he was authorized by written policies to use his own judgment as to how and when to enforce the law by means of a high speed pursuit. In Stuart v. Town of Brookline, 412 Mass. 251, 587 N.E.2d 1384 ______ __________________ (1992), the court upheld a finding of liability against a town for injuries caused by the negligent operation of a police cruiser, but section 10(b) immunity was not even an issue in that case. Appellant's citation of Kelley v. Rossi, is equally ______ _____ unavailing. There the court wrote, in two sentences in a footnote, that a doctor employed by a city hospital and accused of medical malpractice is not engaged in a discretionary function when treating a patient. Id., 481 ___ -48- N.E.2d at 1344 n.6. "The doctor was governed by the standard of accepted medical practice, an ascertainable guide to proper conduct." Id. (citing Cady v. Plymouth-Carver ___ ____ _______________ Regional Sch. Dist.). There is no evidence in the record ___________________ that Meninno's actions were governed by such a fixed standard for police conduct. Moreover, the Massachusetts Supreme Judicial Court recently criticized the reasoning in the case relied upon by the Kelley court: ______ In Cady v. Plymouth-Carver Regional ____ ________________________ School Dist., 17 Mass. App. Ct. 211, 457 ____________ N.E.2d 294 (1983), the Appeals Court announced a principle that it thought distinguished between functions that are discretionary and those that are not. If the employee has no "fixed or readily ascertainable standards to fall back upon," the employee's conduct is discretionary. Id. at 215, 457 N.E.2d ___ 294. . . . The United States Supreme Court has not adopted the rule. Nor have we. The existence of fixed or readily ascertainable standards could be relevant in deciding whether a governmental actor owed a duty to another that he negligently failed to fulfill, but it tells us nothing about whether particular discretionary conduct has a policy or planning foundation. Stoller, 587 N.E.2d at 784 n.2. The many other decisions _______ applying section 10(b) depend heavily on the facts and provide no general principles beyond those articulated in Stoller. See Stoller, 587 N.E.2d at 784 (summarizing cases). _______ ___ _______ As instructed by Stoller, we also look for guidance _______ to federal court decisions. A finding of immunity in this case would be consistent with many cases holding that -49- decisions of law enforcement officers, although seemingly "operational" and made in the heat of the moment, fall within the FTCA discretionary function exception. Generally, although law enforcement agents have a mandatory duty to enforce the law, decisions as to how best to fulfill that duty are protected by the discretionary function exception to the FTCA. Abernathy v. United States, 773 F.2d 184, 188 (8th _________ _____________ Cir. 1985); Redmond v. United States, 518 F.2d 811, 816-17 _______ _____________ (7th Cir. 1975); United States v. Faneca, 332 F.2d 872, 874- _____________ ______ 75 (5th Cir. 1964), cert. denied, 380 U.S. 971 (1965). For ____________ example, we held that a decision by United States Customs agents not to stop and search a particular passenger falls within the discretionary function exception of the FTCA because the applicable statute and regulations authorize, but do not obligate, the agents to search passengers. Attallah, ________ 955 F.2d at 784. Like the situation here, "there is room for choice on the part of the Customs agents when carrying out their duties," and "[t]he decision an agent makes is of great importance in fulfilling the mandate of the Customs Service to protect the integrity of our national borders." Id.; ___ see also Prelvitz v. Milsop, 831 F.2d 806, 810 (8th Cir. _________ ________ ______ 1987) (finding FTCA discretionary function exception applicable to customs inspector's decisions to detain four intoxicated men in an automobile at a border crossing and to "appoint" a different driver). In Buchanan v. United States, ________ _____________ -50- 915 F.2d 969 (5th Cir. 1990), the court held that a prison warden's and staff members' "minute-to-minute decision making in the chaotic circumstances of a riot" met the requirements of the discretionary function exception. Id. at 972; see ___ ___ also Faneca, 332 F.2d at 874-75 (holding that decisions and ____ ______ tactics used by federal law enforcement officials in enforcing desegregation orders and handling resulting riots were within the FTCA discretionary function exception); Smith _____ v. United States, 330 F. Supp. 867, 868-70 (E.D. Mich. 1971) _____________ (holding that FTCA discretionary function exception applied to law enforcement officials' plans and decisions as to handling of Detroit riots); Nichols v. United States, 236 F. _______ _____________ Supp. 260, 262-63 (N.D. Miss. 1964) (holding that FTCA discretionary function exception applied to methods used by federal law enforcement officials in enforcing desegregation orders and quelling riots). FBI agents' decisions to arrest bank robbers and to employ certain tactics to arrest them were also found to be protected by the discretionary function exception from a suit by one bank robber for injuries sustained during the arrest. Amato v. United States, 549 F. _____ _____________ Supp. 863, 866-67 (D.N.J. 1982), aff'd, 729 F.2d 1445 (3d _____ Cir. 1984). But see Hetzel v. United States, No. 91-2986, ___ ___ ______ ______________ 1993 U.S. Dist. LEXIS 7506, at *12-*13 (D.D.C. 1993) (finding that government agents' high-speed pursuit on crowded city streets of suspected drug trafficker, whose identity and -51- address were known, violated approved procedures and so was not within the FTCA discretionary function exception); Patel _____ v. United States, 806 F. Supp. 873, 878 (N.D.Cal. 1992) _____________ (holding that decisions by DEA agents to investigate, obtain search warrant and raid suspected drug hideout were discretionary functions, but decision to destroy house and kill occupants with firebombs was not made pursuant to DEA policy and thus not immune). 5. Holding in Stoller So far, it would appear that 5. Holding in Stoller  __________________ the principles of the section 10(b) exception doctrine as articulated in Stoller and, by analogy, Gaubert point _______ _______ toward tort immunity under the discretionary function exception. We have yet, however, to consider the actual holding in Stoller. Doing so, we are unable to reconcile a _______ finding of immunity here with that holding. In Stoller, the owner of buildings destroyed by _______ fire sought damages pursuant to the Massachusetts Tort Claims Act from the city of Lowell, whose firefighters unsuccessfully fought the blaze. He alleged negligence on the firefighters' part in failing to use the sprinkler systems in one of the buildings. The city conceded that it had a duty to the building owner and that the firefighters could have been found negligent in failing to follow the standard firefighting technique of use of available sprinkler systems. The city, nonetheless, argued that it was immune -52- under section 10(b) because the firefighters' conduct involved a discretionary function. Id., 587 N.E.2d at 782.  ___ The trial judge agreed that the city was immune, but the Supreme Judicial Court reversed. Applying the two- part test discussed supra, the court found that, (1) the _____ firefighters had "discretion in the sense that no statute, regulation, or established municipal practice required the firefighters to use the sprinklers (or, for that matter, to use hoses exclusively)," but that, (2) "whatever discretion they had was not based on a policy or planning judgment." Id. at 785. ___ There are aspects of firefighting that can have an obvious planning or policy basis. The number and location of fire stations, the amount of equipment to purchase, the size of the fire department, the number and location of hydrants, and the quantity of the water supply involve policy considerations, especially the allocation of financial resources. In certain situations, firefighting involves determinations of what property to attempt to save because the resources available to combat a conflagration are or seem to be insufficient to save all threatened property. In such cases, policy determinations might be involved, and application of the discretionary function exception would be required. The case before us is different. The negligent conduct that caused the fire to engulf all the plaintiff's buildings was not founded on planning or policy considerations. The question whether to put higher water pressure in the sprinkler systems involved no policy choice or planning decision. There was a -53- dispute on the evidence whether it was negligent to fail to fight the fire through the buildings' sprinkler systems. . . . The jury decided that, in exercising their discretion not to use the buildings' sprinkler systems, the Lowell firefighters were negligent because they failed to conform to generally accepted firefighting practices. When the firefighters exercised that discretion, policy and planning considerations were not involved. Therefore, the discretionary function exception does not shield the city from liability. Id. ___ It is hard to differentiate between the firefighters' conduct in Stoller and the allegedly negligent _______ decision to pursue of Officer Meninno. The firefighters, in execution of their duty to fight fires, deliberately chose at the time what we assume they considered to be the appropriate strategy for fighting the fire. While, in retrospect, their judgment may have been flawed, no statute, regulation or municipal policy required any different, and they were authorized, indeed required, to make such a determination on their own. An injured party alleged and eventually persuaded a jury that their strategic choice, made pursuant to their governmental duties and in conformance with applicable policies, was negligent. Here, a police officer, in execution of his duty to enforce the laws of the Commonwealth, deliberately chose what he considered to be the best strategy for apprehending a lawbreaker. No statute, -54- regulation or policy prohibited his actions. A town policy expressly authorized and required him to exercise his own judgment as to how to proceed. An injured party now alleges and hopes to persuade a jury that his strategic decision was negligent. Comparing the result in Stoller to this case, one _______ can argue that section 10(b) does not shelter Lakeville from liability for Meninno's actions. Still, it may be that Stoller turned on the firefighters' having violated standard _______ practices with no apparent policy justification, hence is not to be read as more generally eliminating lower level firefighting and police decisions from the section 10(b) exception. In attempting to understand the reasoning of the Stoller court, we have reviewed similar cases from other _______ jurisdictions. A sizable number of them reach the opposite result in analogous circumstances. See 57 Am. Jur.2d ___ Municipal, County, School and State Tort Liability 484, at __________________________________________________ 449 (summarizing cases from ten states). For example, in City of Daytona Beach v. Palmer, 469 So.2d 121 (Fla. 1985), _____________________ ______ the Florida Supreme Court explained: The decisions of how to properly fight a particular fire, how to rescue victims in a fire, or what and how much equipment to send to a fire, are discretionary judgmental decisions which are inherent in this public safety function of fire protection. . . . To hold a city liable for the negligent decisions of its fire-fighters would require a judge or jury to second guess -55- fire-fighters in making these decisions and would place the judicial branch in a supervisory role over basic executive branch, public protection functions in violation of the separation of powers doctrine. We distinguish these types of discretionary fire-fighting decisions from negligent conduct resulting in personal injury while fire equipment is being driven to the scene of a fire or personal injury to a spectator from the negligent handling of equipment at the scene. Id. at 123.  ___ We feel unable to determine the precise aspect of the circumstances in the firefighters' conduct in Stoller _______ that led the court to find their actions were not of the type based on policy considerations. And we are disinclined to introduce new doctrines or fine distinctions of our own into Massachusetts law in order to differentiate the firefighters from Meninno. Yet, neither can we ignore the principles, rules and guidelines articulated by the Massachusetts court in Stoller and in other cases, which apparently point in _______ another direction, so as seemingly to lead to the conclusion that Lakeville is entitled to immunity for the strategic decisions of its police officers made in furtherance of their duties. 6. Certification Essentially, we are faced with 6. Certification _____________ this dilemma: the Massachusetts discretionary function doctrine as expounded in Stoller and Gaubert suggests a _______ _______ -56- finding of immunity, while the result in Stoller seems to _______ mandate the opposite. Resolution of the issue in this case requires reconciling Stoller with Gaubert and other federal _______ _______ and state cases, a project properly left to the courts of the Commonwealth because it may require the development of new rules or distinctions. Moreover, whichever way we decided the issue, our opinion would be seen in Massachusetts as either barring or permitting many other actions against public employers for decisions made by police officers and other municipal servants. We also take notice of the current debate in the Commonwealth on the closely related issue of the public duty rule. See Jean W. v. Commonwealth, 414 Mass. ___ _______ ____________ 496, 610 N.E.2d 305 (Mass. 1993) (abolishing court-created public duty rule prospectively after 1993 legislative session); see also Cyran v. Town of Ware, 413 Mass. 452, 597 ___ ____ _____ ____________ N.E.2d 1352 (1992) (holding, in 3-2 decision, that town firefighters owed no special duty to homeowners whose house was destroyed by fire). The difficult questions raised by the various concurring opinions in Jean W., and the lack of a _______ majority opinion, cautions us about the complexity and social importance of the municipal liability issue in Massachusetts. For these reasons, the best course for a federal court, bound to apply state law as it stands, is certification. -57- On our own motion, we will certify in a separate certification order the following question to the Supreme Judicial Court of Massachusetts pursuant to S.J.C. Rule 1:03: Do the discretionary decisions of a police officer to begin and continue the high-speed pursuit of a vehicle then being operated in violation of law involve policymaking or planning for purposes of immunity under Massachusetts General Law ch. 258, 10(b)? If the question is answered in the affirmative, then the discretionary function exception applies to Meninno's conduct and the district court's grant of summary judgment for Lakeville on this claim will be affirmed. If the question is answered in the negative, then summary judgment was improper and the claim will be remanded to the district court for further proceedings. We would, of course, welcome any guidance the S.J.C. may care to provide, beyond answering the question, concerning the effect and proper application of Massachusetts law in these circumstances. The clerk of this court shall forward as an appendix the briefs and appendix furnished to us by the parties. B. Liability of Freetown for Sullivan's Conduct B. Liability of Freetown for Sullivan's Conduct ____________________________________________ Appellee Freetown argues that it is immune from liability under the Massachusetts Tort Claims Act because Sullivan's conduct falls within the discretionary function exception of section 10(b). After reviewing the record in the light most favorable to the appellant, we hold that the -58- district court should not have granted summary judgment for Freetown on this issue because there is a genuine issue of material fact concerning the first element of the two-part test for discretionary function immunity: whether Sullivan had discretion to engage in the allegedly negligent conduct. The Freetown pursuit guidelines in effect at the time were identical to Lakeville's, and are silent as to most of the decisions made by Sullivan. However, appellant sensibly asks how Sullivan's decision to erect a partial roadblock could be within his discretionary authority when paragraph 12 of the Freetown guidelines expressly states, "Intentional contact between a police vehicle and the vehicle pursued, or use of a police vehicle as a roadblock, is strictly forbidden." The language of this departmental rule appears on its face to forbid the very actions taken by Sullivan. But the record also contains testimony by Officer Sullivan that he interpreted Paragraph 12 to mean merely that police vehicles may not be used to block an entire roadway, ______ as when a cruiser is placed sideways so as to obstruct both lanes of a two-lane road. According to Sullivan, the term "roadblock" has not been interpreted by the Freetown police to include a partial roadblock, such as the one established -59- by Sullivan when he parked his cruiser in the oncoming lane, which leaves room for a vehicle to pass on one side.18  ____________________ 18. The affidavit of appellee Mello, the Freetown police chief, indicates that an official investigation of Sullivan's actions concluded that Officer Sullivan acted appropriately in the circumstances. Chief Mello stated that Freetown had pursuit guidelines in place, but he did not suggest that Sullivan had violated any of these guidelines by using a partial roadblock. The following colloquy regarding paragraph 12 of the Freetown guidelines appears in Officer Sullivan's deposition: Q: [Mr. Gillis, plaintiff's attorney]: So, prior to the collision that is the subject of this lawsuit, you had in your possession a handbook given to you by your commanding officer, is that correct? A: [Sullivan]: Yes, it is. Q: Okay. That handbook contained a section on the policies of the Freetown Police Department concerning pursuing other motor vehicles, did it not? A: Yes, it did. Q: Did it also have a section on the use or nonuse of roadblocks; of blocking the road during pursuits? A: Mr. Gillis, could you define for me what you think, what you would say was a "roadblock" and what is "blocking the road"? I think in my mind they're two different things. Q: Why don't you tell me? What's "blocking the road" mean to you, sir? A: Blocking the roadway would be blocking the total roadway so that nothing could pass your point. Q: Okay. And what is a "roadblock"? A: A roadblock would be one and the same. The roadblock would be blocking the whole roadway. . . . Q: Was there a section in this manual that you were given before August 5, 1988, concerning -60- On this record, there is an unresolved issue of fact regarding Sullivan's discretion under pertinent regulations to have created a partial roadblock, the allegedly negligent conduct on his part. Sullivan's testimony, and Chief Mello's affidavit, suggest the possibility of a narrowed reading of the rule so as to allow Sullivan to do what he did. See, e.g., Kelly v. United ___ ____ _____ ______ States, 924 F.2d 355, 360-61 (1st Cir. 1991) (holding that, ______  ____________________ the use of roadblocks or blocking the roadway? Is there a policy for that in the Town of Freetown? A: Roadblocks as blocking the whole roadway? Q: Yes. A: Yes, there is. Q: And what was that? A: Roadblocks blocking the whole roadway are not allowed under the policy. . . . Q: (Pause) Again, referring to that manual that you mentioned before, that you were given sometime in 1987, or at least prior to August 5, 1988, does the manual say anything specific about blocking the roadway? A: Okay. Again, when you say "blocking the roadway," do you mean a roadblock Q: I mean blocking the roadway in any manner. A: Yes, it does. Q: Blocking a travel lane, or blocking the other lane, in any manner. What does it say about blocking the road? A: The manual advises that to block one lane-way of a roadway, to block some portion of a roadway is permissible. But you are not to block the whole roadway. -61- to avoid summary judgment, plaintiff DEA agent was required to rebut defendants' evidence that seemingly nondiscretionary regulation was consistently interpreted by DEA officials to permit use of discretion). But the language of the regulation, read in the light most favorable to Horta, seems rather directly to forbid such conduct. There is, therefore, a factual issue over whether the regulation should be read to withhold discretion here or whether the departmental interpretation claimed by Sullivan actually existed and was sufficiently consistent and longstanding so as to render his conduct discretionary. Because of this factual issue over whether the first element of the discretionary function exception test was fulfilled, we do not reach whether Sullivan's conduct was based on policy or planning considerations. The latter is, in large measure, the same question certified to the S.J.C. in the case of Meninno. The S.J.C.'s resolution regarding Meninno may answer it. For the moment, we hold simply that Freetown was not entitled to summary judgment on the issue of section 10(b) immunity and remand Horta's claim to the district court for further proceedings.19 V. V.  ____________________ 19. We do not consider to what extent resolution of this issue is within the province of the district judge as opposed to the jury. The district court, with the assistance of the parties, should initially determine this. -62- In conclusion: we affirm the grant of summary judgment for appellees Sadeck, Meninno, and Sullivan on Count I, alleging liability under 42 U.S.C. 1983; we affirm the grant of summary judgment for Freetown on Count IV under the Massachusetts Tort Claims Act for the actions of Sadeck, and vacate the grant of summary judgment for Freetown on Count IV under the Massachusetts Tort Claims Act for the actions of Sullivan and remand that claim for further proceedings; we certify a question of law to the Supreme Judicial Court of Massachusetts on the issue of Lakeville's liability on Count IV under the Massachusetts Tort Claims Act and, pending that court's determination, retain jurisdiction on that issue; and we affirm dismissal of all the remaining claims because appellant did not appeal their dismissal by the district court. Affirmed in part, vacated and remanded in part, and ___________________________________________________ a question certified to the Supreme Judicial Court of _____________________________________________________________ Massachusetts, with jurisdiction retained pending that _____________________________________________________________ determination. No costs. _____________ ________ -63- UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1962 DEBRA HORTA, Plaintiff, Appellant, v. CHARLES B. SULLIVAN, ET AL., Defendants, Appellees. ______________________ CERTIFICATION ______________________ For the reasons discussed in our opinion in this case, Horta v. Sullivan, No. 92-1962, (see especially Part _____ ________ IV.A., at pp. 32-55), the resolution of an important issue depends upon questions of Massachusetts law on which we are unable to find clear, controlling precedent in the decisions of the Supreme Judicial Court of Massachusetts. Accordingly, we certify the following question to the Supreme Judicial Court of Massachusetts pursuant to its Rule 1:03. Do the discretionary decisions of a police officer to begin and continue the high- speed pursuit of a vehicle then being operated in violation of law involve policymaking or planning for purposes of immunity under Massachusetts General Law ch. 258, 10(b)? The relevant facts are discussed in the separate opinion in this case. In putting the above question, we wish to make clear that we would, of course, welcome the advice of the court on any other question of Massachusetts law it deems material to this case on which it would wish to comment. The Clerk of this court will transmit this question and our separate opinion in this case, along with copies of the briefs and appendix in this case to the Supreme Judicial Court of Massachusetts. United States Court of Appeals for the First Circuit ___________________________ By: Juan R. Torruella Circuit Judge Dated: August , 1993 - 65 -