Luis O. DAVILA ALEMAN,
et al., Plaintiffs,

v.

Carmen FELICIANO MELECIO,
et al., Defendants.

No. 96–2301 (JP).

United States District Court,
D. Puerto Rico.

Dec. 15, 1997.

Opinion Supplementing Decision
Jan. 22, 1998.

Roberto Busó Aboy, Hato Rey, PR, Nydia González Ortiz, Yauco, PR, for plaintiffs.

José G. Fagot Díaz, Martínez, Odell & Calabria, Hato Rey, PR, Maressa Abadía Muñoz, Méndez Méndez & Quijano Borges, San Juan, PR, for defendants.

**OPINION AND ORDER**

PIERAS, District Judge.

## I. INTRODUCTION

The Court has before it codefendant Carmen Feliciano–Melecio's Motion for Summary Judgment (**docket No. 46**) and the remaining codefendants' Motion Requesting Summary Judgment (**docket No. 47**). Neither Plaintiff has timely responded, although coplaintiff Abrahán Díaz González has asked for an extension of time to oppose Defendants' motions (**docket No. 51**). However, as he already had thirty days (instead of the ten prescribed by the Federal Rules of Civil Procedure) his motion is hereby **DENIED.** The Court will proceed without benefit of Plaintiffs' input.

Plaintiffs bring this action under 42 U.S.C. § 1983, alleging that Defendants violated their constitutional rights under the First, Fifth, and Fourteenth Amendments when Plaintiffs' respective service contracts were unilaterally terminated by the Department of Health without due process and based on political grounds.[1] Plaintiffs have also brought claims under Commonwealth law, invoking the Court's supplemental jurisdiction.

The facts essential to Defendants' motions are, for the most part, not in dispute. The following facts derive from the Amended Complaint or from the factual stipulations reached at the Initial Scheduling Conference. Plaintiffs are attorneys licensed to practice in the Commonwealth of Puerto Rico. Coplaintiff Luis Davila Aleman is a well-known member of Populares Unidos, known in English as the Popular Democratic Party ("PDP"). In the Amended Complaint, coplaintiff Abrahán Díaz González asserts he is a believer in Independence for Puerto Rico. Except for codefendant Carmen Feliciano–Melecio, who is the Secretary of the Health Department of Puerto Rico, Defendants are all members of the Board of Medical Examiners of Puerto Rico.

On March 14, 1986, coplaintiff Dávila Alemán ("Dávila") entered into a contract with

---

1. The Supreme Court has never determined whether the due process clause applies to Puerto Rico via the Fifth or Fourteenth Amendment. The Court need not address the issue, as the analysis is the same in either case. *Santana v. Collazo,* 714 F.2d 1172, 1174 n. 1 (1st Cir.1983).

the Department of Health by which he agreed to perform services as Administrative Judge for a term of one year. The contract was extended until 1993, when a new contract was executed—Contract # 93–0041. Contract # 93–0041 was renewed annually. It was renewed for the last time in 1996, to remain in force through 1997. The twelfth clause of Contract # 93–0041 read:

> This agreement can be resolved prior to its termination date, by mutual agreement between the parties or by any of the parties, by written notice by any of the parties to the other one, thirty days prior to the date of the purported termination, without any of the parties incurring in any obligation towards each other.

In 1986, Díaz González ("Díaz") entered into a contract with the Department of Health, agreeing to perform services as Legal Counsel for the Board of Medical Examiners for a term of one year. Díaz and the Department of Health extended the contract until 1995, at which time a new contract, Contract # 95–0053, was executed. Contract # 95–0053 was renewed for the last time in 1996, to remain in force through 1997. The 12th clause of Contract # 95–0053 read:

> This agreement can be resolved prior to its termination date, by the first party (Department of Health) by written notice to the other party (Díaz), thirty days prior to the date of the purported termination, without any of the parties incurring in any obligation towards each other.

None of the individual Defendants had the authority to dismiss either coplaintiff because none of the codefendants were parties to the contracts, which were agreements between the respective coplaintiffs and the Department of Health. On September 4, 1996, codefendant Feliciano, in her capacity as Secretary of the Department of Health, sent each coplaintiff a written letter notifying him that his contract with the Department of Health was terminated, effective October 4, 1996. This notification was more than 30 days in advance.[2]

Plaintiffs' First Cause of Action asserts that each Plaintiff had acquired a property interest in his respective contract "due to the fact that they had been renewed for the last ten years . . . thus creating an expectation of continuity." Although Plaintiffs' Amended Complaint does not specifically state it, the Court infers that Plaintiffs First Cause of Action is based on the assertion that Defendants' actions deprived them of their property right in the continuity of those contracts. Plaintiffs' Second Cause of Action asserts that Defendants violated Plaintiffs' "freedom of expression and freedom of association under [the] First, Fourth, and Fourteenth Amendment to the Constitution of the United States." By this, the Court infers that Plaintiffs Second Cause of Action is one for political discrimination asserting that Defendants' actions violated Plaintiffs' right to free association protected by the First Amendment.[3] Plaintiffs' Third Cause of Action is essentially a restatement of the First Cause of Action—claiming that Defendants' actions stripped Plaintiffs of a property interest without due process. Plaintiffs' Sixth Cause of Action asserts violation of Plaintiffs' constitutional right to equal protection. Plaintiffs' remaining causes of action are based on Puerto Rico law.

## II. SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides:

> "[Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for a trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). To make

---

**2.** Additional facts will be raised where relevant, along with the source from which the Court derives those facts.

**3.** Plaintiffs' reliance on the Fourth Amendment is perplexing. The Court believes that its inclusion in the Second Cause of Action must have been unintentional.

this determination, the Court must cull the record for genuine disputes of material fact, drawing all reasonable inferences in favor of the party against whom summary judgment is sought. *See Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir.1987). "Material means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorable to the nonmovant." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995). "A dispute is genuine if the parties' positions on the issue are supported by conflicting evidence." *Int'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir.1996). If there are material factual disputes, summary judgment is inappropriate.

When faced with a motion for summary judgment, the Court may consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Fed.R.Civ.P. 56(c). "In addition, a court may take into account any material that would be admissible or usable at trial ... [but] inadmissible evidence may not be considered." *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir.1993). Moreover, "mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact." *Id.* (citing *August v. Offices Unlimited, Inc.*, 981 F.2d 576, 580 (1st Cir.1992)); *accord Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (court need not credit "conclusory allegations, improbable inferences, and unsupported speculation") and *Int'l Ass'n of Machinists,* 103 F.3d at 200.

## III. ANALYSIS

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

42 U.S.C.A. § 1983 (West 1994). Congress enacted § 1983 to create a remedy in favor of those who are deprived of the rights, privileges, or immunities granted to them by the Constitution or laws of the United States. *Blessing v. Freestone,* 520 U.S. 329, ——, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997). To make a valid claim under § 1983, a plaintiff must prove that the defendants (1) were acting under color of state law, and (2) deprived them of rights, privileges, or immunities secured to them by the Constitution or laws of the United States. 42 U.S.C. § 1983; *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Defendants have admitted that they were acting under color of state law. They dispute, however, that their actions deprived Plaintiffs of any rights, privileges, or immunities.

The Plaintiffs have asserted three distinct federal causes of action—one under the due process clause, the second under the first amendment, and the third under the equal protection clause. Defendants have attacked, via their motions for summary judgment, the first two of Plaintiffs' federal claims. Defendants' motions, however, have confused and amalgamated Plaintiffs' First Amendment political discrimination claim with Plaintiffs' due process claim. The two are wholly distinct and separable. As the Court will discuss in more detail below, Plaintiffs' due process claim depends on a finding that they had a property interest in their employment. Plaintiffs' political discrimination claim, however, can succeed regardless of whether Plaintiffs had a property interest. The Court will address the due process and political discrimination claims and attempt to expound on the distinct aspects of the latter for Defendants' edification.

### A. DUE PROCESS

Plaintiffs' claim that Defendants violated their right to due process is so faulty as to border on specious. It warrants little discussion.

The Due Process clause of the Fifth and Fourteenth Amendments forbids any state from "depriv[ing] any person of life, liberty, or property without due process

of law." The Clause guarantees the right to an informal hearing before the termination of employment that amounts to a property interest. *Cleveland Bd. of Educ. v. Louder-mill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). A property interest in continued public employment is created by "existing rules or understandings that stem from an independent source such as state law." *Id.*, 470 U.S. at 538. Whether a property interest exists in such employment depends upon whether it was objectively reasonable for the employee to believe, based upon either statute or employment contract, that he could rely on continued employment. *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). The Plaintiffs essentially claim that their respective contracts provided them with a legitimate claim of entitlement to employment which amounted to a property interest.[4] We turn to the contracts.

■ In Puerto Rico, contracts are interpreted literally. Article 1233 of the Civil Code provides:

> If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail.

Laws P.R.Ann. tit. 31 § 3471 (1991). Plaintiffs' respective contracts make abundantly clear that they were terminable at will. "Under Puerto Rican law, an agreement is 'clear' when it can 'be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation.'" *Borschow Hospital and Medical Supplies, Inc. v. Cesar Castillo, Inc.*, 96 F.3d 10, 15 (1st Cir.1996); *Hopgood v. Merrill Lynch, Pierce, Fenner & Smith*, 839 F.Supp. 98, 104 (D.Puerto Rico 1993) (J. Pieras), *aff'd* 36 F.3d 1089, 1994 WL 510135 (1st Cir.1994); *see also Heirs of Ramírez v. Superior Court*, 81 P.R.R. 347, 351 (1959). Each contained a clause permitting termination upon notice, and neither required the Department of Health to show cause. Specifically, Dávila's contract provided that the contract could be "resolved prior to its termination date ... by any of the parties" simply by providing written notice thirty days in advance. The clause also clearly states that its use does not give rise to any liability. There are not two ways to interpret this clause—the Department had the right to terminate Dávila's contract as it did. Likewise, Díaz's contract provided that the "Department of Health, by written notice" thirty days in advance, could resolve his contract without incurring any liability. This clause, too, is so clear as to preclude any interpretation but that the Department had the right to terminate Díaz's contract as it did. Thus, under Puerto Rico law, Plaintiffs had no property interest in the continuation of their contracts.

■ Moreover, the renewal of Plaintiffs' contracts does not create a property interest in the continued renewal of those contracts. Plaintiffs' assertion to the contrary defies logic. Each year, both parties had to come together and determine that they wished to extend their contractual relationship. Each year they signed a one-year agreement. The language of the contract is again controlling. The Court cannot infer that the contracts had a duration longer than they clearly stated. To do so would violate Article 1233. The Court's conclusion is bolstered by the fact that the parties altered the terms of their contractual relationship. Dávila and the Department executed a new contract in

---

4. Plaintiffs have no claim that Puerto Rico statutory law provided their property interest. The Puerto Rico Personnel Law, ("Act") Laws P.R.Ann. tit. 3 § 1301–1431, divides government employees into two categories: career employees and confidential employees. Laws P.R.Ann. tit. 3 § 1349. Confidential employees are "those who intervene or collaborate substantially in the formulation of public policy, who advise directly or render direct services to the head of the agency." Laws P.R.Ann. tit. 3 § 1350. These employees are "of free selection and removal." Laws P.R.Ann. tit. 3 § 1336(4). In contrast, career employees are those who enter the civil service system after following the procedures established for competition based upon merit, Laws P.R.Ann. tit. 3 § 1352, and may only be dismissed for "good cause, after preferment of charges in writing." Laws P.R.Ann. tit. 3 § 1336(4). Plaintiffs were certainly not of the latter ilk, and therefore had not property interest based on the Puerto Rico Personnel Law. *Rivera–Ruiz v. Gonzalez–Rivera*, 983 F.2d 332, (1st Cir. 1993).

1993, and Díaz and the Department executed a new contract in 1995. The alteration of terms clearly demonstrates the need, each year, for both parties to come to a meeting of the minds. And each year, the parties placed a set duration on their relationship. That duration must be respected by the Court.

### 1. POLITICAL DISCRIMINATION

As noted above, Defendants' briefs hopelessly confuse the issues of due process and political discrimination. The Supreme Court has held on numerous occasions that an employees' lack of property interest in his continued employment for the purposes of due process analysis is distinct and unrelated to a claim of political discrimination. *See Cordero v. De Jesus–Mendez,* 867 F.2d 1, 20–21 (1989);[5] *e.g., Perry v. Sindermann,* 408 U.S. 593, 597–98, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (citing *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) and *Keyishian v. Bd. of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)) (the nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights). In *Branti v. Finkel,* 445 U.S. 507, 512 n. 6, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court specifically held that "After *Elrod [ v. Burns,* 427 U.S. 347, 360 n. 13, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ], it is clear that the lack of a reasonable expectation of continued employment is not sufficient to justify a dismissal based solely on an employee's private political beliefs." *See also Cordero,* 867 F.2d at 21.

■ Political discrimination does not depend on a "property interest" because the practice of political patronage in nearly every context is abhorrent to just and efficient government, regardless of the existence of a property interest. Political patronage—the act of elected officials rewarding supporters of the same political party or favored localities with lucrative contracts and jobs—hurts the public in most instances. *See Elrod,* 427 U.S. at 353–53. For example, where contracts or jobs are rewarded based on factors

other than the qualifications of the applicant, the risk emerges that performance will not be at the highest level possible or that the cost to that taxpayer will be higher than necessary. Patronage also harms the political system. It smacks of "vote buying," a practice clearly repugnant to democracy. It also carries the potential to contribute to divisive and unproductive partisanship based not on ideals but on the promise of pecuniary gain. For these reasons, patronage, although a part of the American political system since its incipiency and even today, has been disfavored and on the wane since Andrew Jackson's administration popularized and nearly legitimized the practice. That is particularly true of the practice of hiring and firing of public employees based on their political affiliation: "the judgment of Congress, the Executive, and the country appears to have been that partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government, and employees themselves are to be sufficiently free from improper influences." *CSC v. Letter Carriers,* 413 U.S. 548, 554, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *see also Elrod,* 427 U.S. at 355–57 for a discussion of the adverse impact of patronage in public service. Not only does patronage in public service employment undermine the efficiency and fairness of government, but it can also contravene the protections of the First Amendment. To force loyalty in exchange for employment "unquestionably inhibits protected belief and association." *Elrod,* 427 U.S. at 359. The Supreme Court has held time and again that the First Amendment prohibits the hiring and firing of public employees based on their political affiliation.

■ The Supreme Court has also recognized, however, that patronage may support a legitimate government interest. The fact that a practice encroaches the protections of the First Amendment does not always render the practice unconstitutional—the practice may survive if it "further[s] some vital government end by a means that is least restric-

5. Defendants' citation of *Cordero* to support the conclusion that independent contractors can be fired for political reasons is improper. The case clearly stands for just the opposite conclusion.

tive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." *Elrod,* 427 U.S. at 364. In *Elrod,* and later again in *Branti,* the Court recognized that the practice of dismissing public employees in policy-making positions survives the test for constitutionality under the First Amendment. *Branti,* 445 U.S. at 517–18; *Elrod,* 427 U.S. at 367–68. The hiring and firing of certain policy-making personnel has therefore been upheld as constitutional under the so-called *Elrod–Branti* exception.

■ Turning to the case at hand, the First Circuit has developed a now familiar, two-prong test for determining whether a discharge based on political affiliation violates the constitutional protections of the First and Fourteenth Amendment or survives under *Elrod–Branti.*[6] First, the Court must determine "whether the discharging agency's functions entail 'decision making on issues where there is room for political disagreement.'" *Roldan–Plumey v. Cerezo Suarez,* 115 F.3d 58, 61–62 (1st Cir.1997) (quoting *O'Connor v. Steeves,* 994 F.2d 905, 910 (1st Cir.1993)). It cannot be doubted that the

Department of Health is such an agency,[7] *see Jimenez Torres de Panepinto v. Saldana,* 834 F.2d 25 (1st Cir.1987), so the Court turns to the second prong.

■ The second prong requires the Court to "determine 'whether the particular responsibilities of the plaintiffs position, within the department or agency, resemble those of a policy maker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement for continued tenure.'" *Roldan–Plumey,* 115 F.3d at 62 (quoting *O'Connor,* 994 F.2d at 910). In making that determination, "relative pay, technical competence, power to control others, authority to speak in the name of policy makers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders" are all relevant factors. *Id.* (quoting *O'Connor,* 994 F.2d at 910).

One of Defendants' motions managed to address Díaz's job in terms of Plaintiffs' political discrimination claim, but neither addressed Dávila's job.[8] Díaz was contracted

---

6. For the purposes of their motions, Defendants appear to concede that Plaintiffs were dismissed based on their political beliefs.

7. Coplaintiff Díaz admitted as much during his deposition when he agreed that the board "exercised an important public policy in relation to regulating the medical profession."

8. Defendants' attorneys have failed to properly address Plaintiffs' First Amendment political discrimination claims in two respects. First, on the merits, Defendants' motions do not analyze coplaintiff Dávila's position as Administrative Law Judge in terms of whether or not political affiliation is a proper basis for discharge. In fact, codefendant Feliciano–Melecio's brief does not even address Díaz's position as counsel to the board in those terms, leaving the Court to rely on her Codefendants' brief.

Second, and more importantly, neither of Defendants' motions addresses qualified immunity with respect to Plaintiffs' political discrimination claim. The Court believes that qualified immunity is Defendants' best argument with respect to Plaintiffs' political discrimination claim at the summary judgment phase in this case. The central purpose of the doctrine of qualified immunity is to protect state officials in the performance of their duties from undue interference and from threats of liability. *Elder v. Holloway,* 510 U.S.

510, 114 S.Ct. 1019, 1022, 127 L.Ed.2d 344 (1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 806, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Defendants who are government employees are individually shielded from claims seeking civil damages for injuries caused by actions taken within their discretionary authority, unless their conduct "violates clearly established statutory or constitutional rights of which a reasonable person would have been aware." *Harlow,* 457 U.S. at 818. Therefore, the question presented is whether Plaintiffs allege with sufficient particularity the contours of their constitutional rights which were allegedly violated, and if so, whether defendants, actions violated those rights. *Souza v. Pina,* 53 F.3d 423 (1st Cir.1995). In claims of First Amendment violations in cases of political discrimination, the relevant inquiry is "whether the defendant could reasonably believe the position was one that potentially concerned matters of partisan political interest and involved at least a modicum of policy-making responsibility, access to confidential information, or official communication." *Roldan–Plumey v. Cerezo–Suarez,* 115 F.3d 58, 66 (1st Cir.1997) (citations omitted). As Defendants' have failed to address this question, Plaintiffs have not been adequately notified of the issue and its merits. It would be improper at this point for the Court to consider, *sue sponge,* dismissal on qualified immunity grounds.

by the Department to serve as counsel for the Board of Medical Examiners; he represented them as their lawyer. Plf's Amended Complaint ¶ 13; Díaz Depo. p. 17, l. 21. This is clearly the type of position for which political affiliation is a proper criterion. We go through the factors for consideration.

First, the Court holds as a general matter that the position of counsel is the quintessential "trust position." Public employees, like anyone else, ought to be able to hire counsel they feel comfortable with, regardless of the basis for their comfort. In *Ruiz Roche v. Lausell,* 665 F.Supp. 99 (D.Puerto Rico 1987), *aff'd* 848 F.2d 5 (1988), Judge Fusté found as a matter of law that the plaintiff, legal counsel for the president of the Puerto Rico Telephone Company (a public corporation subject to constitutional restrictions), was a trust employee and dischargeable based on political grounds. His position's duties included answering directly to the company president, advising on projected legislation, supervising legal department operation, and coordinating activities between the company and the Commonwealth and Federal government. *Ruiz Roche,* 665 F.Supp. at 100–101. These duties made him a "highly-placed confidant and advisor to the company president." *Id.*

█ Díaz's position was nearly identical to Ruiz Roche's. Díaz handled all complaints filed against the board and all disciplinary actions by the board. Díaz Depo. p. 22, l. 18–24. He drafted legislation and handled cased in which the law was challenged on constitutional grounds. Díaz Depo., p. 26, l. 8–11.[9] He explained settlement issues to the board. Díaz Depo. p. 39–40. The Court finds that those functions alone qualify Díaz as a trust employee. *Cf. Nolla Amado v. Riefkohl–Rivas,* 673 F.Supp. 60, 62 (D.Puerto Rico 1987) (J. Pieras) (legal counsel to the Puerto Rico Aqueduct and Sewer Authority a trust employee for purposes of qualified immunity).

Second, the factors specifically inventoried in *O'Connor,* 994 F.2d at 910, support a finding that Díaz's position was a trust posi-

tion. He was paid $70 per hour, Díaz Depo. p. 18, l. 10, a substantial rate of compensation for a government contractor, indicative of a high-ranking official. He is a Harvard Law School graduate, which bespeaks of technical competence. Díaz Depo. p. 10, l. 13–17. He had authority to speak on behalf of policy-makers in such realms as litigation and legislation. Díaz Depo. p. 26. He was entrusted with confidential information—his meetings were held in private with the board, and, as he put it, he was privy to the "inner sanctum." Díaz Depo. p. 42, l. 21–24. Finally, the Court believes that the position of legal counsel to a politically responsive board perforce requires some degree of political responsiveness. In sum, consideration of the factors declared relevant by the First Circuit dictates the finding that Díaz's position was a confidence position, and the Department was permitted to discharge him based on political considerations.

As Defendants' have not argued the issue of whether Dávila's position—Administrative Law Judge—was a trust position or even whether Defendants are entitled to qualified immunity from his First Amendment claim, the Court cannot address that claim on the merits at this point.

### 2. FAILURE TO JOIN AN INDISPENSABLE PARTY

Defendants assert that this case should be dismissed under Rule 19 for Plaintiffs' failure to join the Department of Health. The Court believes that Plaintiffs' claims should be addressed on a substantive level prior to consideration of whether the Department of Health is an indispensable party.

### IV. CONCLUSION AND FURTHER ORDERS

Defendants' briefs have left untouched several of Plaintiffs' federal claims, and the Court hereby **ORDERS** the Defendants to brief several issues on or before January 9, 1998 and Plaintiffs' to respond on or before January 16, 1998. First, the Court believes

---

**9.** Defendants' attorneys failed to point to these relevant portions of the transcript of Díaz deposi-

tion, creating additional work for the Court.

that Plaintiffs' equal protection claim is suspect and orders the parties to brief its merits." Second, the Court believes the questions of whether Dávila's dismissal falls within the *Elrod–Branti* exception and whether Defendants' are protected by qualified immunity for his dismissal warrant consideration, and the parties shall brief those issues as well. Finally, the Court is concerned with the matter of causation and would like the parties' input on the question of whether members of a board with no individual authority can be held liable under § 1983 for the actions of the board as a whole. This issue was addressed obliquely in Defendants' brief of the indispensable party question, but it has not been addressed as a basis for dismissal on the merits. In order to effectively analyze this issue, the Court must be apprised of the chain of authority at the Department of Health. With respect to Plaintiffs' contracts, what authority does each member of the Board have; what authority does the Board have as a whole; and what authority does codefendant Feliciano–Melecio have? This order does not alter the trial schedule of this case. Pretrial is still set for January 19, 1998 at 2:00 p.m. and trial remains set for January 26, 1998 at 9:00 a.m.

Coplaintiff Díaz's claims for political discrimination and due process violations are hereby **DISMISSED WITH PREJUDICE.** Díaz's claim for violation of his right to equal protection and his pendant Commonwealth claims remain at issue.[10] Coplaintiff Dávila's claim for due process violation is hereby **DISMISSED WITH PREJUDICE.** His claim for political discrimination, his claim for equal protection, and his pendant Commonwealth claims remain.

IT IS SO ORDERED.

### SUPPLEMENTAL OPINION AND ORDER

## I. INTRODUCTION

On December 15, the Court issued an order addressing Defendants' Motions for Summary Judgment (docket No. 52) and or-

dering the parties to brief several additional issues. The Court now has before it the supplemental briefs of codefendant Feliciano–Melecio (**docket No. 56**), of codefendants Vázquez, Marrero Russe, Parilla Barreras, Gaudier Guerra, and Perocier Aguirre (**docket No. 61**), of coplaintiff Díaz González (**docket No. 60**), and of coplaintiff Dávila Alemán (**docket No. 62**). The Court will consider the issues addressed therein—both Plaintiffs' Equal Protection Claims and coplaintiff Dávila Alemán's First Amendment political discrimination claim—as at the summary judgment stage.

Before reaching the merits of the parties' briefs, the Court wishes to briefly address Plaintiffs' contention that they were prejudiced by the Court's requiring them to file their briefs without having received Defendant's briefs. The Court disagrees. This case is set for trial on January 26, 1998, just over a week from the deadline for the briefs. At this point, all evidence has been collected and the lawyers should be fully versed on the legal issues involved (indeed, the attorneys for Plaintiffs should have understood the legal implications of Plaintiffs' claims when the Complaint was filed). Plaintiffs were given ample warning in the Court's Order of December 15, 1997 that the Court was leery of Plaintiffs' Equal Protection Clause claims and of Dávila Aleman's First Amendment political discrimination claim. To get their case to the jury, the Court required Plaintiffs to demonstrate with competent evidence that each element of their case could withstand summary judgment. Because Plaintiffs should be in a position at this point to do that for the jury anyway, they should be capable of mollifying the Court's doubts, and the Court's directive therefore should not prejudice Plaintiffs in any way.

The Court does not condone the failure of Defendants' attorneys to test the trialworthiness of each of Plaintiffs' federal claims when they filed their initial motions requesting summary judgment. Generally, the Court will not do Defendants' work for them. But, in the interest of avoiding unnecessary cost

---

10. By this, the Court does not mean that it has accepted supplemental jurisdiction over any state

law claims. The Court reserves that decision.

and delay, the Court has the obligation to weed out specious or unsupported claims prior to trial in order to streamline the litigation to the extent possible. The Court's challenging the Plaintiffs' claims, *sua sponte*, is accepted practice in this circuit, so long as the parties are given fair notice of "the Court's intention to mull such an approach, and [are] afforded the benefit of the minimum 10 day period mandated by Rule 56." *Stella v. Town of Tewksbury*, 4 F.3d 53, 56 (1st Cir. 1993). The Court fully complied with the prescriptions set forth in *Stella*.

## II. SUMMARY JUDGMENT

[SEE ABOVE OPINION AND ORDER]

## III. ANALYSIS

### A. CO-PLAINTIFF DIAZ GONZALEZ'S EQUAL PROTECTION CLAIM

The Fourteenth Amendment prohibits state action [11] which favors or disfavors a person or persons relative to those similarly situated based on some classification that bears insufficient relationship to a governmental interest. In other words, the government may not treat similarly situated people differently based on classifications made without justification. The character of the classification determines the requirements of the justification. *Plyler v. Doe*, 457 U.S. 202, 216–17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (invidious classifications—those based upon race, religion, nationality, alienage, or some other suspect class and/or those which impinge upon the exercise of a fundamental right—must serve a compelling government interest and no less restrictive alternative can be available); *Craig v. Boren*, 429 U.S. 190–97, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (classifications based on gender or illegitimacy must be substantially related to the achievement of an important government ob-

jective); *Schweiker v. Wilson*, 450 U.S. 221, 234–35, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981) (where the classification is neither invidious nor based upon gender or illegitimacy, it will stand so long as it bears some rational relationship to the advancement of a reasonable and identifiable governmental objective). Coplaintiff Díaz González ("Díaz") asserts that Defendants impermissibly classified him for treatment based on his political affiliation. His assertion fails to support a claim under the Equal Protection Clause for two reasons. First, classification based on political affiliation survives rational relation scrutiny where the classification was used in making employment decisions regarding a trust employee. Second, Díaz González has failed to demonstrate, or even sufficiently allege, that the Defendants set up an impermissible classification for disparate treatment.

Political affiliation has long been recognized as a classification that may not, by itself and absent justification, serve as a basis for disparate treatment among similarly situated people. *See American Sugar Refining Co. v. Louisiana*, 179 U.S. 89, 92, 21 S.Ct. 43, 45 L.Ed. 102 (1900) ("If such discrimination [in the collection of a tax] were purely arbitrary, oppressive, or capricious, and made to depend upon differences of color, race, nativity, religious opinions, political affiliations, or other considerations having no possible connection with the duties of citizens as taxpayers, such exemption would be pure favoritism, and a denial of the equal protection of the laws to the less favored classes."). "Political affiliation, however, is neither a suspect nor a quasi-suspect classification." *Clayton v. Town of West Warwick*, 898 F.Supp. 62, 74 (D.R.I.1995) (citing Laurence H. Tribe, American Constitutional Law 1439–43 (2d. ed.1988)). Therefore, Defendants' alleged conduct in categorizing Díaz based on his political affiliation need only have been

---

11. Contrary to codefendant Feliciano–Melecio's brief, the act of firing an employee or the act of not renewing or terminating a government employment contract can be subject to the protections of the Equal Protection Clause, regardless of whether such acts constitute legislation. Common sense tells us that is so—clearly, a government decision to fire a black employee solely because of his race would implicate issues

of equal protection even though that decision could not be characterized as legislation. *See Cooper v. Aaron*, 358 U.S. 1, 16, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958); *Williams v. Armontrout*, 891 F.2d 656, 659 (8th Cir.1989) ("The equal protection clause is directed to every form of state action—legislation, executive or judicial."); *cf. Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

rationally related to the advancement of a legitimate government interest. The Court's analysis of Díaz's First Amendment claim, *see* Court's Order of December 15, 1997, demonstrates that the Defendants' had a legitimate interest in retaining someone in Díaz's position of a particular political affiliation. *Branti v. Finkel,* 445 U.S. 507, 512 n. 6, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 360 n. 13, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).[12] Because *Elrod* and *Branti* instruct that classification for disparate treatment based upon political affiliation for the purposes of employment decisions furthers a legitimate government interest where the positions duties are like those of Díaz's in his capacity as counsel to the board, *see* Court's Opinion and Order of December 15, 1997, Díaz's equal protection claim must fail. *See Clayton,* 898 F.Supp. at 74.

 Second, a claim under the Equal Protection Clause must "outline facts sufficient to convey specific instances of unlawful discrimination." *Coyne v. City of Somerville,* 972 F.2d 440, 444 (1st Cir.1992). Díaz González has neither alleged nor offered any proof of even a single instance in which persons not affiliated as he or his coplaintiff were treated more favorably. By that failure, Díaz González has failed to establish that Defendants set up any sort of classification—the essence of an Equal Protection claim.

Therefore, his equal protection claim must fail on that ground as well. *Id. Cf. Rodriguez–Guzman v. Garcia,* 901 F.Supp. 45, 49–50 (D.Puerto Rico 1995) (J. Pieras) (claim under Equal Protection made in a perfunctory manner, unaccompanied by some effort at developed argumentation is deemed waived because it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones). The Court having disposed of his Equal Protection claim, Díaz Gonzalez's only remaining claims are based on Puerto Rico law. The Court refuses to exercise supplemental jurisdiction over those claims. 28 U.S.C. § 1367(c)(3).

### B. CO–PLAINTIFF DAVILA ALEMAN'S EQUAL PROTECTION CLAIM

 Coplaintiff Dávila Alemán's Equal Protection Claim mimics that of Díaz González.[13] Under the same analysis applied by the Court to Díaz González's equal protection claim under *Coyne,* Dávila Alemán's equal protection claim must also fail. Moreover, as Dávila Alemán's equal protection claim parallels his First Amendment claim, there exists "little justification for applying equal protection analysis in [this] situation." *Nestor Colon Medina & Sucesores, Inc.,* 964 F.2d at 45.[14]

12. Indeed, the United States Court of Appeals for the First Circuit has specifically noted the overlapping nature of the protections provided by the Fourteenth Amendment's Equal Protection Clause and the First Amendment's implied freedom of association in the context of political discrimination: "[Plaintiff] has no need for protection under the equal protection clause. His equal protection theory is simply that, in addition to violating his First Amendment rights, the denial of permits in purported retaliation for his political expression violated his equal protection rights as well. Given the overlap of these claims . . . we see little basis or justification for applying equal protection analysis . . ." *Nestor Colon Medina & Sucesores, Inc. v. Custodio,* 964 F.2d 32, 45 (1st Cir.1992).

13. In his brief, Dávila Alemán throws his age into the mix. But his Complaint made no mention of age in the context of equal protection, and he never mentioned age during the proceeding of this case. The Court will not recognize any equal protection claim based on age at this point.

14. Codefendants correctly point out that Plaintiffs' equal protection claim was made under 42 U.S.C. § 1985, which permits recovery "only when the conspiratorial conduct . . . is propelled by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). In *Aulson,* the First Circuit refused to reach the issue of whether classifications based on political affiliation were sufficiently invidious to warrant liability under § 1985(3). The circuits that have reached the issue are split. *See id.* at 4–5 (collecting cases). Judges Acosta and Gierbolini in this district have both concluded, using the reasoning of the Supreme Court in *United Brotherhood of Carpenters and Joiners v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), that classification based on political affiliation is not invidious and cannot support a claim under § 1985(3). *See Morales–Narvaez v. Rossello,* 852 F.Supp. 104, 107 (D.Puerto Rico 1994) and *Rodriguez v. Nazario,* 719 F.Supp. 52, 54–55 (D.Puer-

## C. DAVILA ALEMAN'S POLITICAL DISCRIMINATION CLAIM

### 1. The Elrod–Branti Exception

By Order of December 15, 1997, the Court instructed the parties that the question of whether Dávila Alemán's dismissal falls within the *Elrod–Branti* exception and the question of whether Defendants are protected by qualified immunity for Dávila Alemán's dismissal warranted consideration. For that reason, the Court ordered the parties to brief the issues.[15]

 The question of whether a government employee can be hired or fired based in part on her political affiliations turns on the nature of the job at issue. Only codefendant Feliciano–Melecio has provided any competent evidence from which the Court could ascertain the duties or functions of the position held by Dávila Alemán, examining officer for the Department of Health. Dávila Alemán's and the other Codefendants' failure to provide evidence on the matter is difficult to fathom given the obvious need for such evidence in a case such as this. Moreover, the Court holds that the evidence provided by codefendant Feliciano–Melecio is insufficient to establish as a matter of law that the position was one for which political affiliation was an appropriate criterion.

The Court described the *Elrod–Branti* exception in its Order of December 15:

... The Supreme Court has held time and again that the First Amendment prohibits the hiring and firing of public employees based on their political affiliation. The Supreme Court has also recognized, however, that patronage may support a legitimate government interest. The fact that a practice encroaches the protections of the First Amendment does not always render the practice unconstitutional—the practice may survive if it "further[s] some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." *Elrod,* 427 U.S. at 364. In *Elrod,* and later again in *Branti,* the Court recognized that the practice of dismissing public employees in policy-making positions survives the test for constitutionality under the First Amendment. *Branti,* 445 U.S. at 517–18; *Elrod,* 427

to Rico 1989). In light of the Court's conclusion that Plaintiff's claims under the Equal Protection Clause fail on their merits and in the interest of judicial restraint, the Court will not now address the issue of whether classifications based on political affiliation are invidious.

But aside from requiring an invidious classification, a plaintiff suing under § 1985(3) must also identify a cognizable and distinctive group towards which defendant's allegedly class-based animus is being directed. *Aulson,* 83 F.3d at 5. "For this purpose, distinctiveness connotes that a reasonable person can readily determine by means of an objective criterion or set of criteria who is a member of the group and who is not." *Id.* at 5–6. In *Aulson,* the First Circuit found that a "class" made up of persons opposing a political group is indeterminate and therefore insufficient for the purposes of § 1983. *Id.* (citing *Gleason v. McBride,* 869 F.2d 688, 695 (2d Cir.1989) (rejecting class status under § 1985(3) when the plaintiff alleged only that he was a political opponent of the defendants and was extremely vocal in his opposition to their management of the municipality) and *Rodgers v. Tolson,* 582 F.2d 315, 317 (4th Cir.1978) (holding that a complaint which alleged discrimination against a class of persons in political and philosophical opposition to municipal commissioners did not describe a cognizable class and therefore

failed to state a cause of action under § 1985(3))). "The lack of distinctiveness is especially striking [where] the proposed class is defined primarily in the negative; that is, ... with reference to what it opposes ... rather than with reference to what it espouses." *Id.* Like the plaintiff in *Aulson,* Plaintiffs here attempt to define a class in the negative—they are not members of the New Progressive Party. But they are also not themselves identifiable by a shared characteristic. Plaintiffs' Complaint asserts that Dávila Alemán is a "well-known member of Populares Unidos" and that Díaz González "is a believer in Independece [sic] for Puerto Rico." Under *Aulson,* then, Plaintiffs have failed to identify a distinctive, readily identifiable class as required by § 1985(3).

15. The Court did not ask for briefs respecting Díaz González's political discrimination claim, as that was decided on the merits by the Court's Order of December 15, 1997. For this reason, the Court did not expect Díaz González, who is represented by different counsel than Dávila Alemán, to address the issue. Díaz González did address the issue of qualified immunity, but with respect to his claim. As that issue is moot under the Court's previous determination that Díaz González's First Amendment claim falls under the *Elrod–Branti* exception, the Court will not address it.

U.S. at 367–68. The hiring and firing certain policy-making personnel has therefore been upheld as constitutional under the so-called *Elrod–Branti* exception.

... the First Circuit has developed a now familiar test for determining whether a discharge based on political affiliation violates the constitutional protections of the First and Fourteenth Amendment or survives under *Elrod–Branti.* First, the Court must determine "whether the discharging agency's functions entail 'decision making on issues where there is room for political disagreement.'" *Roldan–Plumey v. Cerezo–Suarez,* 115 F.3d 58, 61–62 (1st Cir.1997) (quoting *O'Connor v. Steeves,* 994 F.2d 905, 910 (1st Cir.1993)). It cannot be doubted that the Department of Health is such an agency, *see Jimenez Torres de Panepinto v. Saldana,* 834 F.2d 25 (1st Cir.1987), so the Court turns to the second prong.

The second prong requires the Court to "determine 'whether the particular responsibilities of the plaintiff's position, within the department or agency, resemble those of a policy maker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement for continued tenure.'" *Roldan–Plumey,* 115 F.3d at 62 (quoting *O'Connor,* 994 F.2d at 910). In making that determination, "relative pay, technical competence, power to control others, authority to speak in the name of policy makers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders are all relevant factors." *Id.* (quoting *O'Connor,* 994 F.2d at 910).

In analyzing the second prong of a political discharge claim, the description of the position held by plaintiff is generally the best, and sometimes dispositive source for determining the position's inherent functions. *Roldan–Plumey,* 115 F.3d at 62. No such description has been provided, and it appears that no written description of Dávila

Alemán's position, examining officer, exists. Instead, codefendant Feliciano–Melecio relies on the following evidence in support of her argument that Dávila Alemán held a position for which political affiliation was a valid criteria. First, The Professional and Consulting Services Contract between Dávila Alemán and the Department of Health instructs Dávila Alemán "to act as Examining Officer in the Administrative Hearings before the Board of Medical Examiners of Puerto Rico in cases where a controversy for medical malpractice, unprofessional conduct or any other sanctionable conduct is decided, as provided by Law Number 22, of April 22, 1931, as amended." That duty description or job title, by itself, certainly does not render Dávila Alemán's position a trust or policy-making position. *See Roldan–Plumey,* 115 F.3d at 62–63 (holding that hearing examiner does not hold a position for which political affiliation is a valid criteria under *Elrod–Branti* anti doctrine). Next, codefendant Feliciano–Melecio argues that the lack of a written job description allows for "discretionary policy implementation in the politically responsive Board of Medical Examiners." The Court disagrees that the lack of an official job description necessitates a finding that the job entailed the discretion to make or implement policy. The Contract specifically states that Dávila Alemán was to serve as a hearing examiner "under the supervision of the President of the Board of Medical Examiners of Puerto Rico." Without any testimony as to the actual functions Dávila Alemán performed, the Court can see no logical connection between the absence of a written job description and a finding that the position necessarily called for the exercise of discretion.[16] Feliciano–Melecio next asserts, without any evidentiary support, that Dávila Alemán dealt with highly confidential issues regarding complaints. Without evidentiary support, however, the assertion carries no weight and cannot even be considered. The final facts upon which Feliciano–Melecio relies—that in order to obtain his contract, Dávila Alemán interviewed with the President of the Board of Directors, that Dávila

---

16. For example, a laborer might execute a contract to perform services of a general nature. The fact that his contract does not specifically enumerate his duties does not render his position one for which political affiliation is a legitimate criteria.

Alemán had discretion in scheduling the time and day of hearings, and that he had no deadlines for performing his duties—simply have nothing to do with an *Elrod–Branti* analysis of the connection between the position and political affiliation. In sum, in light of the absence of any competent, relevant evidence, the Court finds that a genuine material factual dispute exists as to whether Dávila Alemán's job involved the type of functions that would render it a policy-making or trust position for the purposes of the *Elrod–Branti* exception.

### 2. Qualified Immunity

■ "Qualified immunity shields government officials performing discretionary functions from civil liability for money damages when their conduct does not violate 'clearly established' statutory authority or constitutional rights of which a reasonable person would have known." *Roldan–Plumey*, 115 F.3d at 65 (quoting *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 704 (1st Cir. 1993)); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "In the context of political discrimination charges, 'a defendant enjoys qualified immunity as long as the job in question potentially concerned matters of partisan political interest and involved at least a modicum of policymaking responsibility, access to confidential information, or official communication.'" *Roldan–Plumey*, 115 F.3d at 65.

Defendants in this case are clearly not protected by qualified immunity based on any notion that the law of political discharge was not clear at the time of their actions. As the First Circuit noted in *Roldan–Plumey*, by 1994, long before the conduct at issue in this case took place, "the contours of the law regarding discharge based on party affiliation" were "clearly established." 115 F.3d at 66. Additionally, Defendants could not reasonably have believed that independent contractors may be dismissed based on their political affiliation, and no immunity springs from that contention. As the Court noted in its Order of December 15, 1997, "the Supreme Court has held on numerous occasions that an employees' lack of property interest in his continued employment for the purposes of due process analysis is distinct and unrelated to a claim of political discrimination." *Cordero v. De Jesus–Mendez*, 867 F.2d 1, 20–21 (1989); *see also Branti*, 445 U.S. at 512 n. 6 ("after *Elrod*, it is clear that the lack of a reasonable expectation of continued employment is not sufficient to justify a dismissal based solely on an employee's private political beliefs").

Therefore, the Court can imbue Defendants with qualified immunity only if Defendants could reasonably have believed that Dávila Alemán's position "was one that 'potentially concerned matters of partisan political interest and involved at least a modicum of policymaking responsibility, access to confidential information, or official communication.'" *Id.* In other words, Defendants might be entitled to qualified immunity if they could reasonably have believed that Dávila Alemán's position fell under the *Elrod–Branti* exception. In making that determination, the Court would "look only to the inherent duties of [the] position." *Id.* But, as noted above, Defendants have not provided any relevant evidentiary basis for establishing the inherent duties of Dávila Alemán's position. Without any evidence, the Court cannot determine whether reasonable people in Defendants' positions could have considered Dávila Alemán's position one for which political affiliation was an appropriate criterion. Therefore, a genuine issue of material fact remains on that point.[17]

### D. DAVILA ALEMAN'S SUPPLEMENTAL CLAIMS

■ Coplaintiff Dávila Alemán's only remaining federal claim is under 42 U.S.C. § 1983 for political discrimination in violation of the First Amendment. In the Complaint, Dávila Alemán also states causes of action for (1) damages under Article 1802 of the Puerto Rico Civil Code, P.R.Laws Ann. tit. 31 § 5141 for mental anguish, humiliation, embarrassment, and impairment of reputation;

---

17. The Court's finding of a genuine issue of material fact clearly precludes interlocutory appeal of the denial of Defendant's motion for summary judgment. *Tang v. State of R.I. Dept. of Elderly Affairs*, 120 F.3d 325, 326 (1st Cir.1997).

(2) damages under the same provision for tortious interference with contract; (3) for "neglect to prevent"[18]; and (4) for age discrimination under Puerto Rico Law 100. The Court believes that accepting supplemental jurisdiction over these several, diverse claims brought under Commonwealth law would lead to these claims predominating over the federal claim remaining. For this reason, the Court refuses to accept supplemental jurisdiction over Dávila Alemán's Commonwealth law claims. 28 U.S.C. § 1367(c)(2).

## IV. CONCLUSION

The Court hereby **DISMISSES WITH PREJUDICE** both Plaintiffs' claims under 42 U.S.C. § 1985 for alleged violation of their constitutional right to equal protection of the laws. The Court refuses to accept supplemental jurisdiction over Plaintiffs' Commonwealth law claims and hereby **DISMISSES** all of Plaintiffs' claims under Puerto Rico law **WITHOUT PREJUDICE.** The only remaining claim is coplaintiff Dávila Alemán's claim under 42 U.S.C. § 1983 for alleged political discrimination in violation of his First Amendment rights.

IT IS SO ORDERED.

---

**18.** Although no statutory provision is mentioned in the Complaint as supporting this cause of action, the Court assumes it is made under Puerto Rico law.